UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADLEY A. ARNDT,

        Plaintiff,                          Case No. 15-11108

                                          Paul D. Borman

v.                                    United States District Judge

FORD MOTOR COMPANY,             Anthony P. Patti
a Delaware Corporation,             United States Magistrate Judge

        Defendant.

_____/

## OPINION AND ORDER GRANTING FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 75)

In this disability discrimination action, Plaintiff claims that Defendant Ford Motor Company ("Ford") violated the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* and the Michigan Persons With Disabilities Civil Rights Act ("PWDCRA"), by failing to engage in good faith in the interactive process regarding his request to have his service dog accompany him to work as an accommodation for his Post-Traumatic Stress Disorder ("PTSD"), and for failing and refusing to accommodate his PTSD, resulting in Plaintiff's constructive discharge.

Before the Court is Defendant's motion for summary judgment. (ECF No. 75.) Plaintiff responded (ECF No. 88), and Ford replied (ECF No. 92). The Court held a

1

hearing on November 28, 2016. Following the hearing on the motion for summary judgment the parties engaged in facilitation, which was unsuccessful in resolving the case. For the reasons that follow, the Court now GRANTS Ford's motion for summary judgment.

## I.   FACTUAL BACKGROUND

Plaintiff Bradley Arndt served in the United States Army for 24 years, with numerous deployments in combat zones. It is undisputed that, as a result of his military experiences, he suffers from Post Traumatic Stress Disorder ("PTSD") and mild traumatic brain injury ("mTBI"). (ECF No. 75-2, Def.'s Mot. Ex. A, Oct. 28, 2015 Deposition of Bradley Arndt 22:20-24; ECF No. 75-5, Def.'s Mot. Ex. D, February 16, 2016 Deposition of Dr. Carol Lindsay-Westphal 37:3-6.)

Just prior to joining Ford as a process coach in August, 2012, Plaintiff was working as a production supervisor at Faurecia, an auto supply company. (Arndt Dep. 263:12-19.) In the Spring of 2012, Plaintiff commenced a disability leave from Faurecia and ultimately resigned voluntarily from his job at Faurecia. (Arndt Dep. 240:13-241:8, 263:20-264:24.)

Plaintiff started at Ford in August, 2012, and was hired as a process coach (a manufacturing supervisor) at Ford's Van Dyke Transmission Plant. Arndt worked the afternoon to 2:30 a.m. shift in the "clean room" reporting to Vito Evola. (Arndt Dep.

2

241:13-242:14.) The "clean room" is a climate controlled area of the plant where hourly workers assemble the brains of the transmissions; the parts are susceptible to quality issues and workers wear lab coats. (ECF No. 75-7, Def.'s Mot. Ex. F, October 30, 2015 Deposition of Vito Evola 8:5-15.)

In February, 2013, Arndt approached Evola and explained that he was having issues at work due to symptoms from his PTSD and mentioned the idea of bringing his service dog, Cadence, to work with him. (Evola Dep. 37:12-38:14.) Evola's first reaction was positive – he thought the dog could be "like a mascot." Evola later reconsidered and thought there might be safety or quality concerns. (Evola Dep. 38:18-39:16.) On Saturday, February 22, 2013, Plaintiff sent an email to Human Resource Salaried Personnel Representative Stephanie Roseman explaining that he had missed work the previous day due to his PTSD and mTBI and asking about the possibility of bringing his service dog, Cadence, to work with him. (ECF No. 88-8, Pl.'s Resp. Ex. 7, February 22, 2014 Email from Arndt to Roseman.) In the email, Plaintiff explained what service animals are trained to do, including calming people with PTSD when they have an anxiety attack, and represented that his service dog is "highly trained" and carried a "certification with the ADA" and had "all of his shots."

3

(*Id.*)[1]  The email explained that he was hesitant in making the request because he feared being discriminated against because of his request, which appeared to have no precedent that he could discover at Ford. (*Id.*) Ms. Roseman replied to the email first thing Monday morning, February 25, 2013, thanking Plaintiff for trusting her with the information and explaining that she would "do some research on Ford's policies (including issues with service animals in the plant)" and would let him know as soon as possible. (*Id.*) Plaintiff responded that evening, thanking her for looking into the issue and asking if she got "any resistance" to please just stop pursuing the matter because he did not want his request to tarnish his name. (*Id.*)

Ms. Roseman provided Plaintiff with a Disability Reasonable Accommodation Request form, which Plaintiff completed and submitted on February 26, 2013. (ECF No. 88-9, Pl.'s Resp. Ex. 8.) Along with his Reasonable Accommodation Request form, Plaintiff submitted a letter addressed "to whom it may concern," largely reiterating what he had explained to Ms. Roseman in his February 22, 2013 email and explaining the following list of functions that his service dog could provide to Plaintiff in the workplace:

He is trained to sense when an anxiety or panic attack is going to

---

[1] Plaintiff admitted in his deposition that this statement regarding an ADA certification was not true, "there was no certification." Arndt Dep. 194:1-15. Plaintiff could not explain why he used the word "certification" because his dog had no certification at that time. *Id.*

4

> happen, then he is able to guide me and direct me to a quiet calmer place, he is trained to keep people at arms length from my location, he also watches behind me to keep people from startling me as to not set off a trigger from me, provide Tactile Stimulation during intense moments of stress and panic, and "Watch my back," he also provides a great deal of comfort and security when he is near, thus giving me the utmost confidence to perform my job.

(ECF No. 88-9, Pl.'s Resp. Ex. 8 at 2, PgID 3187.) Plaintiff noted on the request form that his request was "time sensitive" because any delay could result in his absence from the work place. (*Id.*)

On March 13 (or 14), 2013, Plaintiff met with the Van Dyke plant doctor, Dr. Arthelia Brewer, regarding his accommodation request. (ECF No. 75-6, Def.'s Mot. Ex. E, November 4, 2015 Deposition of Arthelia J. Brewer, M.D. 30:19-31:4.) Plaintiff testified that at the March 13, 2013 meeting, Dr. Brewer commented on his extensive resume and suggested that there was surely some position that would be available for Plaintiff, perhaps in Dearborn or perhaps "here" at the Van Dyke plant, and it would all be "open to discussion." (Arndt Dep. 191:24.-192-19.) Dr. Brewer completed a Visit Summary Report summarizing the purpose of the visit, i.e. to discuss Plaintiff's ADA request to bring his service dog to the workplace due to PTSD. (ECF No. 88-10, Pl.'s Resp. Ex. 9, 3/14/13 Visit Summary Report.) Dr. Brewer summarizes Plaintiff's history of PTSD and notes as follows: "(1) Release of information form given employee for completion to allow verbal and written

5

communication with the social worker, psychologist and psychiatrist at the VA. (2) Will work with HR to see if an accommodation can be made. However, there are H&S concerns with allowing a dog in the manufacturing area." (*Id.* at 2.)

The day after meeting with Dr. Brewer, on March 15, 2013, Plaintiff formally withdrew his accommodation request. (Arndt Dep. 191:5-11; ECF No. 88-12, Pl.'s Resp. Ex. 11, March 15, 2013 email from Plaintiff to Roseman, PgID 3191-92.) Plaintiff testified that he withdrew his request because he received some negative feedback from his supervisor Vito Evola and because he did not want to transfer to a Dearborn location. (Arndt Dep. 199:5-21.) He was "scared of going to a new environment, a new place, a new job." (Arndt Dep. 199:10-11.) Plaintiff testified that after he met with Dr. Brewer he went back to Ms. Roseman and was upset that Dr. Brewer brought up possibly transferring to Dearborn. (Arndt Dep. 183:21-184:4.) He told Ms. Roseman that he had some concerns with "the high population of Arabs in Dearborn," that "seeing people walking down the street in a burka" could cause flashbacks – it presented a "much greater case" for his PTSD than the plant environment. (Arndt Dep. 184:5-17.) Plaintiff had "concern that it would cause [him] undue stress and flashbacks working around a lot of Arabs," and he was "angry" when he talked to Ms. Roseman about the possibility of a move to Dearborn both because he liked his job at the Van Dyke plant and did not want to relocate and

6

because he feared "seeing people walking around in burkas" would set off flashbacks. (Arndt Dep. 185:4-186:12.)  Plaintiff testified that he was never formally offered a transfer to Dearborn as an accommodation, but that he and Ms. Roseman discussed it and Plaintiff told her that he was hired to work as a production supervisor, not in the "Glass House" (Ford World Headquarters).  (Arndt Dep. 201:1-25.)  Ms. Roseman testified that Plaintiff told her he was withdrawing the request because he did not want to be a bother and she told him it was no bother – that they had to engage in the interactive process and that he needed to let the process work and be patient. (ECF No. 75-4, Def.'s Mot. Ex. C, January 19, 2016 Deposition of Stephanie Lovinger Roseman 40:24-41:10.)  Ms. Roseman told him if he insisted on withdrawing his request he should put that in writing, and formally retract his request, which Plaintiff did on March 15, 2013.  (Roseman Dep. 43:9-12; ECF No. 88-12, Pl.'s Resp. Ex. 11.)

Following Plaintiff's withdrawal of his February 26, 2013 accommodation request, Ms. Roseman sent an email to Maria Conliffe, the Manager of Equal Employment Planning at Ford, to inform her of what had transpired with Plaintiff's withdrawn request. (ECF No. 88-11, Pl.'s Resp. Ex. 10, March 27, 2013 Email from Roseman to Conliffe.)  Ms. Roseman explained in her follow-up email to Ms. Conliffe that because there were concerns with having a service animal (even a

7

trained one) in the plant environment, they asked Dr. Brewer to review the request and Plaintiff's medical file and to meet with Plaintiff to advise on "other feasible and reasonable accommodations." (Pl.'s Resp. Ex. 10, 3/27/13 Email.) Ms. Roseman explained to Ms. Conliffe that Dr. Brewer met with Plaintiff, requested him to provide medical release forms so that Dr. Brewer could speak with his personal physician to discuss the request, and Plaintiff left the meeting with Dr. Brewer and immediately withdrew the request. (*Id.*) The email explains that Plaintiff indicated to Ms. Roseman that there was information in his personal medical file that no one at Ford needed to know about and that was not relevant to his work and "might scare us." (*Id.*) Ms. Roseman was seeking Ms. Conliffe's advice on how to proceed. (*Id.*) Ms. Roseman was surprised that Plaintiff so abruptly withdrew his request and she sent his retraction request to a number of individuals asking "what do we do with this?" (ECF No. 88-12, Pl.'s Resp. Ex. 11, March 15, 2013 Email from Roseman to Mark Willis, Joan Treves, Arthelia Brewer, Linda Beggs and Vito Evola.) There is no evidence in the record that any further action was taken with regard to Plaintiff's February 26, 2013 accommodation request by either Plaintiff or Ford.

In early April, 2013, Plaintiff took a medical leave of absence because of factors related to his PTSD. (ECF No. 89-16, Pl.'s Resp. Ex. I, February 16, 2016 Deposition of Carol Lindsay-Westphal, PhD. 39:5-22.) Plaintiff reported to his

8

treating psychiatrist, Dr. Lindsay-Westphal, that he feared at that time that he would "lose his temper and unexpectedly hurt someone." (Lindsay-Westphal Dep. 39:23-25.) Dr. Lindsay-Westphal issued Plaintiff a return to work letter on or about May, 20 2013, when his symptoms had lessened and he was "back at his baseline symptomology." (Lindsay-Westphal Dep. 50:19-51:14; Pl.'s Resp. Ex. 14, May 20, 2013 Letter from Dr. Lindsay-Westphal "to whom it may concern," explaining that Plaintiff's exacerbation of his PTSD symptoms had subsided and he was fit to return to work.) Plaintiff returned to work and continued to work in the "clean room."[2]

In October, 2013, Plaintiff was reassigned by Ford to Machining and began reporting to Steve Sowers. (Arndt Dep. 242:15-23.) Plaintiff's job duties in Machining involved periodically being on the plant floor, checking for safety issues

---

[2] Relying on Plaintiff's affidavit filed in support of its response to Ford's motion for summary judgment, Plaintiff suggests in a sentence that when Arndt returned to work in May, 2013, and continued complaining to certain employees, like the nighttime manager, about environmental issues at the plant that triggered his PTSD, Ford's duties under the ADA were triggered again to engage in the interactive process, even though Plaintiff had withdrawn his first accommodation request and no additional request for an accommodation had been made. (ECF No. 88-4, Pl.'s Resp. Ex. 3, July 22, 2016 Affidavit of Bradley Arndt ¶¶ 17-18; Pl.'s Resp. 7-8.) Plaintiff offers no legal authority in support of this suggestion and did not develop this argument further, either in briefing or at oral argument. "'It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones.'" *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *Meridia Prods. Liab. Lit. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006)). "'[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Id.* (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).

9

and monitoring productivity and otherwise being at a desk monitoring data regarding production on a computer. (ECF No. 89-19, Pl.'s Resp. Ex. L, October 30, 2015 Deposition of Steven Sowers 9:2-11:7.) When on the plant floor, Plaintiff experienced loud noises from machines and startling interactions with people that were "problematic" for him. (Arndt Dep. 246:6-247:20.) He also was bothered when in his office space, which "closed him in" and exacerbated his PTSD. (Arndt Dep. 247:21-249:8.)

On October 23, 2013, just weeks after beginning to work in Machining under Mr. Sowers, Plaintiff commenced another medical disability leave. (ECF No. 89-9, Pl.'s Resp. Ex. B, November 4, 2015 Deposition of Arthelia Brewer, M.D. 66:18-20.) This leave extended to February 20, 2014, when Plaintiff was authorized by Dr. Lindsay-Westphal to return to work with the "presence of a service dog, Cadence." (*Id.*)

Sometime in early 2014, prior to his return to work, Plaintiff sent Cadence for training with Joseph Tullier, a veteran with PTSD, who trained dogs for the military. In an undated letter addressed "to whom it may concern," Mr. Tullier confirms that his company, Acadian Canine Training, LLC, agreed to train Cadence in three general areas: (1) "general service dog behavior" including "basic obedience, environmental training, socialization training;" (2) "Post-Traumatic Stress Disorder service dog

behavior," such as cue owner's anxiety and redirecting focus, wake owner during nightmares, cue owner when unsuspecting individual walks towards him;" and (3) "Traumatic Brain Injury Service Dog" behavior including "carrying a pack with owner's personal effects, stability assistance," and location and reminder services." (Pl.'s Resp at 8, Ex. 20, Dec. 2, 2013 letter from Joe Tullier of Acadiana Canine Training, LLC "To Whom It May Concern" at the Department of Veteran's Affairs regarding upcoming training of Cadence.) Plaintiff relies Tullier's testimony to support the claim that Cadence was well trained specifically to handle the stressors that might arise in the Ford Van Dyke factory environment. (ECF No. 88, Pl.'s Resp. 17-18, PgID 3108-09; ECF No. 89-21, Pl.'s Resp. Ex. N, January 28, 2016 Deposition of Joseph Tullier.) Tullier's deposition testimony describes the training that Cadence received in late December and early January of 2014, some of it specific to handling loud noises and several of the stressors that Plaintiff identifies as triggers for his PTSD. Tullier testified that Cadence was undistracted by loud noises, different floor surfaces, bubble wrap underfoot, etc. and passed her "environmental test" with no problems. (Tullier Dep. 62:8-68:9.) Tullier testified that as "far as environmental, [he] did everything possible that [he] needed to do to ensure Brad that he was going to work in any environment." (Tullier Dep. 68:7-10.) Tullier expressly acknowledged, however, that "he didn't have a factory" to test Cadence in but did

11

everything possible to "make loud noises, fast movement, people walking around, etc." (*Id.* at 68:23-69:2.) Tullier could not recall exactly what Plaintiff had told him about the plant environment at Ford but he was generally aware that Cadence would be going into a plant environment, although he did not know the specifics of the Van Dyke plant, so he did the "max possible" noises, explosions and distractions to ensure Cadence would be good in any environment. (*Id.* at 70:15-74:13.) Tullier testified that Cadence would survive any environment but that the real concern would be the effect of the environment on his handler, the Plaintiff. (*Id.* at 74:13-75:1.) According to Tullier, Cadence was not aggressive and did not have a mean bone in his body. (*Id.* at 76:7-9.) Tullier could not recall exactly what Plaintiff explained to him about the environment on the plant floor but Tullier expected that the dog would be with Plaintiff at all times on the plant floor and there was no reason why he should not be allowed to accompany him there. (*Id.* at 87:15-88:25.) In preparation for what Plaintiff might encounter at work, Tullier trained Cadence to be vocal - make a high pitched whine - if people were getting too close to Brad. (*Id.* at 114:2-21.) He is not a "vice" dog - not going to react in a threatening way - just going to cue Brad that someone is near. (*Id.* at 117:9-118:1.) If Brad has an anxiety or panic attack, Cadence will nudge Brad so Brad knows he is not alone - it's the two of them - and it snaps Brad out of it and winds him down. (*Id.* at 118:2-19.) Tullier knew that

Plaintiff had been diagnosed with PTSD but did not recall the particulars of Plaintiff's condition. (*Id.* at 120:17-121:12.) He put booties and goggles on Cadence and he tolerated them well. (*Id.* at 122:18-124:10.) Tullier had never worked or even been in a manufacturing facility when operations were up and running, apart from a middle school field trip. (*Id.* at 109:19-110:20.) Tullier issued his own "registration" certificate for Cadence sometime in early 2014, but there is no official national registry or certification for a dog once it is trained. (*Id.* at 95:11-97:5.) Tullier testified that no one from Ford ever contacted him about Cadence's training in 2013 or 2014. (*Id.* at 129:3-25.) While Ford did possess a single-page certificate regarding Cadence's training, there is no evidence that Plaintiff attempted to make Ford aware of all of these details of Cadence's training with Tullier during the interactive process.

On February 21, 2014, Plaintiff reported to work at the Van Dyke medical department with a medical release from Dr. Lindsay-Westphal authorizing a "return to work with the restriction of presence of a service dog, Cadence." The Return to Work was effective February 20, 2014 and had "no end point." (ECF No. 88-24, Pl.'s Resp. Ex. 23, Return to Work Certification for Ford Motor Company SALARIED Employees.) Plaintiff submitted his formal Disability Reasonable Accommodation Request on February 21, 2014. (ECF No. 88-25, Pl.'s Resp. Ex. 24, "Disability

Reasonable Accommodation Request" form.)  The specific accommodation he was requesting was "service dog at work." (*Id.*)  The request was marked "time sensitive" so that Plaintiff could "return to work [] possible to be productive for the company." (*Id.*)  In response to the question on the form that asked "what, if any, job function are you having difficulty performing," Plaintiff responded: "hyper-sensitivity/emotional control/fear loud noise/closed in spaces/people surprising you/all these issues effect [sic] my ability to function daily/my dog takes this away."  (*Id.*)  In response to the question on the form "what limitation is interfering with your ability to perform your job or access an employment benefit," Plaintiff responded: "facing life's small overlooked issues traveling in car anxiety of being around people and startling." (*Id.*)  In response to the question on the form that asked, "If you are requesting a specific accommodation, how will that accommodation assist you," Plaintiff responded: "Bring my PTSD service dog to work so I can be as productive as possible." (*Id.*)  Plaintiff provided the following additional information: "1) Traveling to work - issues with traffic to and from with cars on side of the road . . . create hostile memories, service dog enables this travel; 2) my abilities are not impaired to work, it is the environment in which I'm present that causes severe anxiety/fear/transferred memories "flashbacks" to war time environment. Service dog is trained to sense these issues and acts to prevent these issues occurring." (*Id.* at 2.)

14

Karen Humes had replaced Stephanie Roseman as Ford's salaried personnel representative in February, 2014, and Ms. Humes became the point person on Plaintiff's accommodation request. (ECF No. 89-15, Pl.'s Resp. Ex. H, October 29, 2015 Deposition of Karen Humes 31:23-32:11.) Ms. Humes received a phone call from Kathy Shartreau from Unicare, Ford's third party administrator for medical benefits, that Plaintiff was returning to work, moving off of medical leave status and back to active status. (Humes Dep. 27:11-30:3.) The decision to move Plaintiff back to active status was made by Ms. Humes boss, Joan Treves, who was the head of Human Resources for the Van Dyke plant. (Humes Dep. 30:4-6; ECF No. 89-20, Pl.'s Resp. Ex. M, November 5, 2015 Deposition of Joan Treves 6:15-25; 22:3-18.) Because the request to bring a service animal to the plant was a novel issue, and was going to take time for the company to determine, Plaintiff was placed on "no work available" or "unfit to work" status while his request was under consideration. This classification was necessary so that Plaintiff could continue to receive his full salary and benefits while the company researched and worked through his request to bring the dog to the plant. Ms. Treves explained to Plaintiff that they were in "kind of a limbo state" and were classifying him that way to make sure that his compensation would be continued. (Treves Dep. 78:5-80:14.)

Ms. Treves was the person directing Ms. Humes through the ADA process.

15

Ms. Treves would be assisting Ms. Humes with understanding the process, knowing what steps needed to be taken to evaluate the request, and checking to see the progress of the exchange. (Treves Dep. 22:3-18.) Ms. Humes would be the individual interfacing with the Plaintiff to understand what the request was and to follow the processes associated with data collection. (Treves Dep. 23:17-23.) Ms. Treves was responsible for interacting with members of management, analyzing data that was collected and ultimately working through to a recommendation. (Treves Dep. 22:13-15.) Ms. Treves had multiple meetings, conversations and email exchanges with Ms. Humes regarding Plaintiff's request. Ms. Treves was responsible for assisting Ms. Humes in making sure that Ms. Humes understood what the processes were. Ms. Humes was a relatively recent hire and was still familiarizing herself with the Ford processes, but Ms. Treves felt that Ms. Humes was very capable of data gathering on Plaintiff's request as she had come from another automotive manufacturing company where she had been an HR professional. (Treves Dep. 23:2-24:24.)

In fact, this was Ms. Humes's first instance dealing with a request for accommodation under the ADA and Ford put together a team of people, (Joan Treves (HR), Les Harris (personnel relations), Maria Conliffe (HR management), Tony Dalimonte (Ford legal), Dr. Heckman (company physician)), to assist her in carrying

out the interactive process. (Humes Dep. 32:12-35:2; Treves Dep. 26:19-29:15.) Ms. Humes relied on Les Harris, Ford's head of personnel relations, who directed her to Ford's policies dealing with the ADA, and she relied on Ms. Treves, who instructed Ms. Humes to use the team as a foundation, to take information she received back to the team as she gathered data from the Plaintiff. (Humes Dep. 46:14-49:8; ECF No. 89-13, Pl.'s Ex. F, January 26, 2016 Deposition of Leslie Harris 12:9-18.)

Ms. Humes and Plaintiff's supervisor Steve Sowers met with Plaintiff on March 4, 2014, to gather information about Plaintiff's specific limitations and how those limitations interfered with his work tasks. (Humes Dep. 79:2-80:3.) Ms. Humes asked Plaintiff what aspects of his job he was unable to do and Plaintiff continually responded that he could perform all aspects of his job but that there were environmental factors that become problematic and he just needed to have his dog with him to alleviate those environmental factors − but Plaintiff kept insisting that there was no aspect of his job that he was unable to perform if he had Cadence with him. Ms. Humes found this contradictory because Plaintiff never could articulate what aspects of his job he was specifically unable to perform. (Humes Dep. 82:17-85:11, 86:17-22.) Plaintiff testified that Mr. Sowers commented at this meeting that Cadence looked like "a lazy dog." (Arndt Dep. 161:16-25.) Plaintiff felt that Ms. Humes continually asking him the same question over and over, "what he could not

17

do," was condescending. (Arndt Dep. 158:14-160:17.)

Following the March 4, 2014 meeting, on March 5, 2014, Ms. Humes sent a questionnaire to Dr. Lindsay-Westphal which was incorrectly addressed and was returned to Ford as undeliverable. (ECF No. 88-29, Pl.'s Resp. Ex. 28; Lindsay-Westphal Dep. 156:15-157:10.) Plaintiff states that rather than take affirmative steps to follow up with Dr. Lindsay-Westphal when the return questionnaire was not forthcoming, Ms. Humes dispatched a certified letter to Plaintiff advising that his doctor had not responded to Ford's questions and that Ford had been unable to proceed with his request in the meantime. (ECF No. 88-30, Pl.'s Resp. Ex. 29, 3/25/14 Letter to Arndt from Humes.) In response, Plaintiff personally delivered Ford's questionnaire to Dr. Lindsay-Westphal, which she completed and Plaintiff delivered to Ms. Humes on April 4, 2014. (ECF No. 89-1, Pl.'s Resp. Ex. 31, Primary Care Physician Accommodation Questions and Answers; Humes Dep. 135:21-136:18.) The following questions were posed by the Ford questionnaire and the following answers were given by Dr. Lindsay-Westphal:

> Q:   After having examined the employee and reviewed the attached summary of the employee's job, is the employee able to perform the essential functions of the job without any accommodation? If not, what functions is the employee unable to perform?

> A:   In my professional opinion, Mr. Arndt is very capable of the skills required for a process coach. His biggest obstacle is the ordinary

events that come with maintaining a full time job, such as transportation and unexpected negative interactions with strangers and co-workers. For example, most of us take our commute as a matter of routine, but for Mr. Arndt who may well experience flashbacks of an IED when he sees a broken car parked on the side of the road, these otherwise ordinary incidents become significant obstacles to work. The presence of his trained service dog enables him to maintain his high level of functioning by sensing tension and calming him before the tension becomes problematic.

Q:   Please describe the nature of the impairment that prevents the employee from performing the functions of the job identified in your response to (1) above. Describe with specificity the nature and severity of the impairment, and the specific ways in which the impairment prevents the employee from fulfilling the relevant job requirements.

A:   As indicated in my response to question #1, and verified by the excellent performance reviews he received while working at Ford Motor Company, I am unaware of any functions of the process coach that Mr. Arndt is unable to do. Were he to return to work today, I believe he would again perform the duties well. Over time, however, unless he has his service dog to help him remain calm and well-focused on tasks at hand, his longevity in the workplace is doubtful. In respect to specificity, problems may arise if, for example, Mr. Arndt has a flashback en route to work, is especially distracted and emotionally distressed by intrusive thoughts, feelings and memories around the anniversary of traumatic combat events. In such cases, he may have a difficult time making it to work. In respect to severity, without his service dog, his symptoms are very severe, with the presence of his service dog, these symptoms would probably go unnoticed to all but Mr. Arndt or a mental health professional well trained in PTSD.

Q:   Please list any other major life activities, other than working, that

are substantially limited by the employee's medical condition. . . .

A:    Without his service dog, Mr. Arndt's hypervigilance to danger impairs his ability to relax and venture into new places. With his service dog he is actively working on going into stores, movie theaters, and other public places that previously generated excessive anxiety over potential unexpected dangers.

Q:    Are there any accommodations that you believe would permit this employee to perform the requirements of the job? . . .

A:    Were Mr. Arndt allowed to have his service dog in his vehicle on his commute to and from work, and under his desk in his office during his shift, the dog would provide the calming interventions that will enable him to complete his job duties.

Q:    Please describe with specificity the nature of the medical examination or other measures taken to diagnose the employee with the impairments listed in (2) above.

A:    Mr. Arndt has been diagnosed with Postraumatic Stress Disorder (PTSD) by myself, another licensed clinical psychologist at the John D. Dingell VAMC. . . .

(Pl.'s Resp. Ex. 31, dated April 1, 2014.)

Dr. Lindsay-Westphal testified that although she supplied the return to work for Plaintiff with the restriction of a service dog, Plaintiff's was the first accommodation request she had ever addressed and she did not do any independent research into the service dog's ability to negate Plaintiff's PTSD symptoms but relied solely on Plaintiff's representations of what the dog could do for him. It was Plaintiff

who suggested the service dog as an accommodation, not Dr. Lindsay-Westphal, as she had no independent professional knowledge of how the service dog was trained or what he was capable of doing to eliminate the symptoms of Plaintiff's PTSD. (Lindsay-Westphal Dep. 68:5-69:17, 117:17-118:10.) At a session with Plaintiff on February 25, 2014, Plaintiff was accompanied by Cadence and he explained that the dog had just returned from special training in Louisiana and that Plaintiff was happy with the training the dog received. Plaintiff did not describe for Dr. Lindsay-Westphal what he expected the dog to do for him in the context of his work at the plant. (Lindsay-Westphal Dep. 119:10-120:4.) At this session on February 25, 2014, Plaintiff asked Dr. Lindsay-Westphal to sign a medical release so that the Ford doctors could speak with her. (Lindsay-Westphal Dep. 120:5-16.) She testified that she based her opinion that Plaintiff could return to work and perform his job duties on Plaintiff's representations about what his dog could do for him – she has never been on a manufacturing plant floor and thus had no opinion regarding how the dog would assist Plaintiff in that environment. In fact, based on the number of medical leaves Plaintiff had taken from work, she doubted his "longevity" in the workplace and did not know if the service dog could correct his need for frequent absences. (Lindsay-Westphal Dep. 126:4-130:25.)

Ms. Humes returned to the team after she received Dr. Lindsay-Westphal's

responses on or about April 3, 2014, and, after consulting with other team members who had been doing their own research into other aspects of the issue, the team collaboratively came up with a list of specific questions to ask Plaintiff at a second meeting to be scheduled to try to address the missing information still necessary in their view to address Plaintiff's request. (Humes Dep. 200:16-202:6, 216:10-217:25; 266:8-12.) As can be seen by the privilege log produced by Ford, there were several, indeed multiple weekly, meetings/emails/conferences among the team members between April 3, 2014 and the next scheduled meeting specifically addressing Plaintiff's request. (ECF No. 73, Second Amended Privilege Log.)

Ms. Humes contacted Plaintiff on May 8, 2014, to schedule a second meeting. (Humes Dep. 222:19-224:9.) Ms. Humes gave Plaintiff three dates from which to choose, ultimately agreeing on May 13, 2014, and explained to him that he was expected to come to the plant to attend the meeting. (Humes Dep. 227:8-228:13.) Ms. Humes did not recall whether she told Plaintiff, who was on full paid leave at the time, that a failure to appear on one of those dates could result in disciplinary action, but she did recall that she was having trouble getting him to come to the plant. (Humes Dep. 218:16-10.) Plaintiff states that he was "ordered" to come to the plant and was threatened with discipline if he did not attend the meeting. (Arndt Dep. 46:19-47:6, 138:23-139:12.) Plaintiff was upset by the tone of Ms. Humes email

22

confirming that he would attend the meeting on May 13, 2014, and responded to her email asking about the purpose of the meeting and explaining that it was giving him great anxiety to be kept in the dark about what was going on and asking why he was being summoned and threatened. Ms. Humes never responded to Plaintiff's email, in which he expressed confusion and concern over how long the process was taking and how much trouble he was obviously causing the company. (Arndt Dep. 139:23-143:2; ECF No. 89-2, Pl.'s Resp. Ex. 32, May 10, 2014 Email from Plaintiff to Humes.)

The meeting took place on May 13, 2014, with Ms. Humes and Mr. Sowers, to go over the questions generated by the team and to gather additional information. (ECF No. 89-4, Pl.'s Resp. Ex. 34, May 13, 2014 Interoffice Memorandum Re: Brad Arndt/List of Questions ("the List")[3]; Humes Dep. 236:12-238:2; 266:8-16.) As of May 13, 2014, there had been no resolution either way regarding Plaintiff's request to bring the dog to work and the process was still ongoing. (Humes Dep. 91:10-92:4.) Plaintiff appeared at the meeting on May 13, 2014, with his service dog Cadence, and Plaintiff felt that Mr. Sowers was disengaged and judgmental of Plaintiff's request in a negative way because Mr. Sowers would not look Plaintiff in the eye. (Arndt

---

[3] Plaintiff speculates that this List never really existed. As discussed *infra*, however, there is insufficient evidence in the record to create a genuine issue of material fact that this List did not exist.

Dep. 220:1-221:8.)  Ms. Humes began the May 13, 2014 meeting with the first question on the List, which was: "What job functions, if any, do you believe you are not currently able to perform without accommodation?" (Humes Dep. 236:12-238:2; Arndt Dep. 221:6-25.)  Plaintiff was very offended by this question which he felt he had answered clearly in their first meeting in March:

> Q: All right, so what happened next.
>
> Arndt: Karen said she had more questions to ask.  And then she asked the first question, and I said, "I've already answered these questions over and over and over again.  I don't feel that you're treating me properly.  I don't – you're just asking the same thing of what can't I do, what can't I do, what can't I do."  So I reached in my wallet, pulled out my Ford ID, put it on the table, and I said, "This is probably for the best," and I gave them my Ford ID.
>
> Q: All right. So what – did she get out a full question or did you recognize the question kind of midway through and tell her that that – that's the same thing?
>
> Arndt: No. She said, "What is it can't you do?"
>
> Q: All right. And that's when you said I've heard this before and got out your badge?
>
> Arndt: Yeah.

(Arndt Dep. 221:9-222:1.)

Ms. Humes similarly testified that they never got past the first question because Plaintiff insisted he had already answered that question multiple times, and he refused

24

to continue the meeting unless Ms. Humes would commit to giving him an answer by Monday morning, which she stated she would be unable to do because the interactive process was ongoing, with which Plaintiff placed his badge on the table and quit. Both Ms. Humes and Mr. Sowers testified that they asked Plaintiff to reconsider and to stay and continue to engage in the process. (Humes Dep. 246:9-247:13, 271:18-272:3, 273:23-274:9.) Plaintiff did not deny that Ms. Humes and Mr. Sowers asked him to stay and reconsider, but he could not recall whether they did or not. (Arndt Dep. 222:2-19.) Ms. Humes eventually went out of the meeting and asked her boss what she should do. She was instructed to get a statement in writing from Plaintiff that he was quitting voluntarily. (Humes Dep. 271:18-274:14.) Plaintiff did provide the following handwritten note:

> I Bradley A. Arndt as of this day Tuesday May 13, 2014 do resign my position as a process coach for the Van Dyke Transmission Plant. I do so on my own accord and not influenced by anyone either from Ford Motor Company or the Van Dyke Transmission Plant in Sterling Heights, Michigan.
>
> Signed The 13th Day of May 2014
>
> Bradley A. Arndt

(ECF No. 75-2 Def.'s Mot. Ex. A, Arndt Dep. Ex. 9, PgID 1816.)

Later the day of the May 13, 2014 meeting, Ms. Humes sent herself an email in which she summarized what had transpired at the meeting with Plaintiff. (Humes

Dep. 247:22-248:22; ECF No. 75-3, Humes Dep. Unmarked Exhibit, May 13, 2014 email from K. Humes to K. Humes PgID 1906-07.) The email is consistent with Ms. Humes deposition testimony and acknowledges that when Plaintiff walked into the meeting room Plaintiff expressed the feeling that there was an "issue" because Mr. Sowers would not look him in the eye. (5/13/14 email PgID 1906.) The memo states that after Mr. Sowers explained he had "a lot of things on his plate," Plaintiff seemed ok. (*Id.*) Ms. Humes started the meeting by explaining that she would be asking Plaintiff 14 questions and entering his responses into her computer as he answered. (*Id.*) She started with the first question and Plaintiff stated that he had already answered that question and would just turn in his card at that time. (*Id.*) Ms. Humes "explained to him that this is an interactive process and that Van Dyke HR is part of the team that is reviewing his request." (*Id.*) She explained that these questions were follow up and meant to help the team better understand Plaintiff's request for the service dog as an accommodation. (*Id.*) Ms. Humes states in her email that she tried to reassure Plaintiff that Ford wanted to continue the process and she could continue with the questions. (*Id.*) Plaintiff responded that unless she could guarantee him a response by the following Monday, he wanted to resign from his position. (*Id.*) Ms. Humes states that Plaintiff said he did not want to be "that guy" with a service dog and PTSD and that his doctor was trying to get him full medical disability. (*Id.*) Ms.

26

Humes asked Plaintiff again if he was interested in continuing and when he said no, she asked him to provide a written resignation letter, which he "did willingly." (*Id.*)

Plaintiff has a slightly different view of the facts surrounding the May 13, 2014, meeting and the events that led up to that meeting. In his statement of facts submitted to the EEOC in support of his claim of discrimination, in testimony largely consistent with his deposition, Plaintiff states that the question regarding what functions of his job he was unable to perform had been answered, by both him in the March 4, 2014 meeting with Ms. Humes and by his doctor, Dr. Lindsay-Westphal, in her return to work form and her Questionnaire responses (quoted *supra*). (ECF No. 75-2, Def.'s Mot. Ex. A, Arndt Dep. Ex. 10, PgID 1819.) Plaintiff found Ms. Humes to be "very short, demanding, and verbally abusive" after he submitted his request to return to work with his service dog. (*Id.*) Plaintiff states that on May 9, 2014, Ms. Humes contacted him via phone and demanded that he come in the following week for an interview. (*Id.*) Plaintiff informed Ms. Humes that he had a medical appointment and would like to make the meeting the following week, to which Ms. Humes responded that if Plaintiff did not appear on one of three dates, he would be found non-compliant and dismissed. (*Id.*) Plaintiff stated in his statement of facts to the EEOC that he resigned the day of the meeting on May 13, 2014, because it was clear from Ms. Humes's and Mr. Sowers's "belittling and uncaring mannerisms" that

27

they did not want him as an employee. (*Id*. at PgID 1820.)

Plaintiff criticizes Ford's decision to put Ms. Humes, an individual with no ADA training or experience, as the point person on Plaintiff's request. (ECF No. 88, Pl.'s Resp. 11.) During discovery, Plaintiff's counsel examined all of the involved Ford witnesses, including the top human resource individuals such as Ms. Conliffe and Ms. Treves, about a written policy produced by Ford entitled "Disability Accommodation Process." (The "DAP"). None of these witnesses was familiar with the DAP policy, although they testified that it generally outlined the procedures that they did follow when addressing a request for a reasonable accommodation. (Treves Dep. 70:5-74:16.) Ms. Conliffe testified that in 2011 or 2012, she and her boss and Ford's in-house counsel put together a formalized plan with respect to the accommodation process, created a power point presentation and posted this policy online on their One HR website. (Conliffe Dep. 14:7-17:25.) This is the online resource that Ms. Roseman, Ms. Humes, Ms. Treves and Ms. Conliffe testified they were familiar with and consulted in engaging with Plaintiff in the interactive process.[4]

After Plaintiff resigned, the VA increased his compensation rating to 100% based on a finding that he was unemployable, retroactive to October 15, 2013. (Arndt

------

[4] Plaintiff produces no evidence that the DAP policy was the resource that these employees were required to consult or that had they consulted that resource they would have done things differently.

28

Dep. 278:9-280:16.) Plaintiff has not earned income from employment since leaving Ford in May, 2014. (Arndt Dep. 262:9-22.)

Plaintiff filed a charge with the EEOC on November 22, 2014, claiming that Ford had failed to reasonably accommodate his PTSD. On February 6, 2015, the EEOC dismissed the charge, noting in part that: (1) Plaintiff disclosed to Dr. Brewer that a transfer to a Dearborn desk job "may cause him further mental anguish due to the high Arab American population;" (2) Ford submitted evidence that Plaintiff was paid 100% of his salary until the day he voluntarily quit on May 13, 2014; (3) Plaintiff's resignation letter reveals that Plaintiff resigned of his own accord and was not influenced by anyone and his resignation letter did not mention any refusal by Ford to reasonably accommodate his medical condition; and (4) "[n]o evidence has been provided revealing that [Plaintiff was] able to perform the essential functions of [his] position with or without a reasonable accommodation." ( ECF No. 75-16, Def.'s Mot. Ex. O, Baumhart Decl. Ex. 1, Feb. 6, 2015 EEOC Notice of Dismissal of Charge.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a

summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary

judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor

of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

32

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid.* It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III.   ANALYSIS

### A.   The Reasonable Accommodation Framework

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).[5]  The ADA

---

[5] The Michigan PWDCRA "substantially mirrors" the Federal ADA and absent a claim that the two should be analyzed separately, the Court analyzes both claims under the ADA standards. *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012). *See also Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) ("Claims under the

"defines 'discrimination' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)). A failure to accommodate is thus just a form of discrimination under the ADA. "In order to establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) [he] is disabled within the meaning of the Act; (2) [he] is otherwise qualified for the position, with or without reasonable accommodation; (3) [his] employer knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011) (alterations added). As part of the *prima facie* case, the employee bears the burden of demonstrating that his requested accommodation is reasonable. *Walsh v. United Parcel Service*, 201 F.3d 718, 725 (6th Cir. 2000) (citing *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996)); *Kleiber*, 485 F.3d at 870 ("plaintiff bears the initial burden of establishing that the accommodation he or she seeks is reasonable").

"The ADA also "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." *Rorrer v.*

---

PWDCRA "essentially track those under [the ADA].") (alterations in original).

*City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (citing *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)) (alteration and ellipsis in original). "The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Id.* (citing *Kleiber*, 485 F.3d at 871). "The purpose is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. The ADA mandates this process to ensure that employers do not disqualify applicants and employees based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Id.* (internal quotation marks and citations omitted).

Both parties must collaborate in the interactive process and ""[w]hen a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility."" *Lafata v. Church of Christ Home for the Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) (citing *Kleiber*, 485 F.3d at 871). "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *Id.* (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

"Employers who fail to engage in the interactive process in good faith [] face

liability [under the ADA] if a reasonable accommodation would have been possible." *Id.* (internal quotation marks and citations omitted) (alterations in original). "'[T]he employer fails to participate in the interactive process only if, among other things, the employee can demonstrate that the employee could have been reasonably accommodated but for the employer's lack of good faith.'" *Arthur v. American Showa, Inc.*, 625 F. App'x 704, 711 (6th Cir. 2015) (quoting *Breitfelder v. Leis*, 151 F. App'x. 379, 386 (6th Cir. 2005)). An employer's alleged failure to engage in good faith in the interactive process is not independently actionable under the ADA – "that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (internal quotation marks and citation omitted) (emphasis omitted). "Courts thus need not consider this form of non-independent liability if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Id.* (internal quotation marks and citation omitted).

The Sixth Circuit has observed that paid sick leave is a reasonable accommodation. *Hankins v. The Gap, Inc.*, 84 F.3d 797, 801 (6th Cir. 1996) (noting that "[t]he EEOC specifically mentions the use of paid and unpaid leave as a potential form of reasonable accommodation"). *See* "Interpretive Guidance on Title I of the

36

ADA," 29 C.F.R. § Pt. 1630.9, App. (noting that "accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave"). *See also Swanson v. Village of Flossmoor*, No. 11-cv-4421, 2014 WL 4652120, at *6 (N.D. Ill. Sept. 18, 2014) (noting that circuit courts, including the Sixth Circuit, have held that paid leave is a reasonable accommodation) (citing *Hankins*, 84 F.3d at 801-02).

Ford does not dispute that Plaintiff's PTSD is a disability. The dispute in this case centers on the second element of the *prima facie* case, i.e. whether Plaintiff was qualified for the position with or without reasonable accommodation, and also on whether Ford engaged in good faith in the interactive process to determine an appropriate reasonable accommodation. Plaintiff submits that there are three issues before the Court: (1) whether or not Ford engaged in good faith in the interactive process with Plaintiff following his accommodation request; (2) whether Ford failed to reasonably accommodate Plaintiff; and (3) whether a reasonable person in Plaintiff's position would have felt compelled to resign (constructive discharge). ECF No. 888, Pl.'s Resp. 1. The Court will address these issues as Plaintiff has framed them.

**B.      Was Ford Required to Engage In The Interactive Process and If So Did It Do So In Good Faith?**

As discussed above, an employer's alleged failure to engage in good faith in the interactive process is not independently actionable under the ADA and an employer will be found to have failed to participate in good faith "only if, among other things, the employee can demonstrate that the employee could have been reasonably accommodated but for the employer's lack of good faith." *American Showa*, 625 F. App'x at 711.   "Courts thus need not consider this form of non-independent liability if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation."    *E.E.O.C. v. Ford*, 782 F.3d at 766 (internal quotation marks and citation omitted).   If the interactive process is required, both parties must participate in good faith in the process and if there is a breakdown in that process, the Court must "attempt to isolate the cause of the breakdown and then assign responsibility." *Lafata*, 325 F. App'x at 422.

As a threshold matter, the Court concludes that there is no genuine issue of material fact that the interactive process here lasted three months.  Plaintiff withdrew his February 26, 2013 Disability Reasonable Accommodation Request (ECF No. 88, Pl.' Resp. Ex. 8) on March 15, 2013, just a few weeks after submitting it and before

38

Ford had the opportunity to take meaningful action on his request. (ECF No. 89-8, Arndt Dep 191-92.)[6] Plaintiff then filed a new and separate request a year later, in February, 2014. There is evidence that Plaintiff's abrupt rescission of his initial January, 2013 request took Ford by surprise, and also evidence that Ford may have initially encouraged Plaintiff to pursue his request. On April 2, 2013, Ms. Roseman sent an email to Plaintiff stating that the plant was interested in moving forward with the ADA process in an effort to accommodate him but needed medical information to assist with his request.[7] (Pl.'s Resp. Ex. 12, April 2, 2013 Email from Roseman to Arndt.) It is undisputed, however, that Plaintiff did formally withdraw that request

---

[6] Plaintiff suggests in an Affidavit filed subsequent to his deposition that he withdrew his request in part because of Ford's "intrusive request" regarding medical documentation. (ECF No. 88-4, July 22, 2016 Affidavit of Bradley Arndt ¶ 10.) However, in his deposition, when asked point blank why he withdrew his February, 2013 accommodation request, Plaintiff responded that he received feedback from Vito Evola that he did not think it was a good idea and that he was scared of the possibility of being moved to Dearborn to "a new environment, a new place, a new job . . . a new commute, new place, new people." (Arndt Dep. 199:7-21.) Even crediting Plaintiff's Affidavit, he concedes that he formally withdrew his February, 2013 accommodation request on March 15, 2013.

[7] Plaintiff relies on this post-retraction email to suggest that the interactive process that had begun in response to Plaintiff's February, 2013 accommodation request actually never ceased, despite the fact that Plaintiff admits that he formally withdrew his request on March 15, 2013 in a written communication and did not want to proceed at that time. Plaintiff argues that when Plaintiff returned from his April medical leave, in May, 2013, Ford was under an obligation to resume the interactive process, even though no accommodation request was pending at that time. There is no evidence to suggest that either the Plaintiff or Ford took any further steps with regard to Plaintiff's February, 2013 accommodation request after he unequivocally retracted it on March 15, 2013.

39

and did not respond to any communications regarding re-commencing the process. He did not renew his request until he filed his second accommodation request on February 21, 2014. (ECF No. 88-25, 2/21/14 Disability Reasonable Accommodation Request.) Thus, the Court rejects Plaintiff's attempt to portray this as a 15-month interactive process when in fact it was a three-month process. The Court finds no genuine issue of material fact that the relevant interactive process occurred between February 21, 2014, when Plaintiff submitted his second accommodation request, and May 13, 2014, when Plaintiff handed in his badge and terminated his employment with Ford, thus ending the interactive process.

1.    **Plaintiff has not presented sufficient evidence to create a genuine issue of material fact that Plaintiff's PTSD could have been reasonably accommodated with or without accommodation.**

Because an employer's alleged failure to engage in good faith in the interactive process is not independently actionable under the ADA unless the employee can demonstrate that the employee *could* have been reasonably accommodated but for the employer's lack of good faith, an initial and potentially dispositive inquiry is whether Plaintiff has presented evidence sufficient to create a genuine issue of material fact that his PTSD could have been reasonably accommodated by Ford had Ford engaged in good faith in the interactive process.

Ford argues that discovery has revealed that Plaintiff could not have been

40

accommodated with or without reasonable accommodation because there is no evidence in the record that having a service dog with him at all times as a manufacturing supervisor at the Ford plant, including on the factory floor, would have enabled him to perform the essential functions of his job as a process coach. If true, this relieves Ford of liability for a failure to engage in good faith in the interactive process. *See Lafata*, 325 F. App'x at 422; *Deister v. AAA Auto Club of Michigan*, 91 F. Supp. 3d 905, 928 (E.D. Mich. 2015), *aff'd, Deister v. Auto Club of Michigan*, 647 F. App'x 652 (6th Cir. 2016) ("[T]he Sixth Circuit has indicated that an employer is not liable for failing to engage in the interactive process unless the plaintiff can show that a reasonable accommodation was possible.").

Even Plaintiff's treating psychologist did not offer the opinion that Plaintiff's service dog could actually prevent Plaintiff from reacting to triggers in his manufacturing supervisor job. In fact it was Plaintiff who suggested to Dr. Lindsay-Westphal that he needed to have his dog with him and Plaintiff informed her that his dog was trained to get in between him and strangers and to sense when he was getting anxious. But Dr. Lindsay-Westphal had no professional knowledge of how service dogs were trained and could not express an opinion on how the dog would have helped Plaintiff to deal with certain situations on the plant floor when his PTSD otherwise would prevent him from performing his job. Specifically, in answering the

41

Primary Care Physician Accommodation Questions, Dr. Lindsay-Westphal did not mention how the dog would assist Plaintiff on the plant floor. She mentioned that the dog helped Plaintiff to relax in social situations, going into stores, movie theaters and other public places. (ECF No. 89-1, Dr. Lindsay-Westphal Question Responses.) She opined that if he could have his dog in the car with him on his commute to work and under his desk at his office, the dog would provide calming interventions that would enable Plaintiff to complete his job duties. She never opined about Plaintiff's ability to meet the challenges presented by the plant floor environment with the assistance of his service dog. (*Id.*) She testified that she is unfamiliar with the work environment at the plant and is not qualified to suggest specific accommodations. Indeed, Dr. Lindasy Westphal questioned whether Plaintiff could sustain a position in the manufacturing environment for any length of time with or without a service dog. (Lindsay-Westphal Dep. 68;12-69:17. 113:11-118:10, 125:22-128:13.)

Plaintiff submits that Ford never indicated to Plaintiff that there was any problem with Dr. Lindsay-Westphal's answers or that they needed additional information. Instead, Plaintiff claims, now that Ford had the answers they had requested, Ford continued to fail to act. However, as is evident from her questions and answers, Dr. Lindsay-Westphal never actually opined on the most critical question that Ford was attempting research – *i.e.* what specific job functions Plaintiff

was prevented from performing due to his PTSD and how the service dog would assist Plaintiff in enabling him to perform those functions. Dr. Lindsay-Westphal did not purport to offer an opinion as to how Cadence would assist Plaintiff in dealing with his fellow employees whom he supervised and how the dog would tolerate and assist Plaintiff with the environment on the plant floor. Dr. Lindsay-Westphal opines as to the help the service dog would provide on the commute to work and under Plaintiff's desk at work. But this does not address the full scope of Plaintiff's requested accommodation, which clearly included having Cadence available on the plant floor where Plaintiff would encounter loud noises and startling events, as well as in his office where he would feel his PTSD symptoms exacerbated by the closed in space. In fact, Dr. Lindsay-Westphal's responses do not express *any* opinion on how the service dog would be of assistance to Plaintiff with regard to the actual duties he is required to perform on a daily basis, supervising numerous employees on the production facility floor.

Similarly Ford's expert, Dr. Liza Gold, opined that "there is no evidence that the symptoms that precluded Mr. Arndt's occupational functioning, that is inability to tolerate usual and unusual workplace stress over time and managing his irritability and anger, would have been adequately controlled by the presence of the service dog such that Mr. Arndt could perform the essential functions of a supervisory position."

43

(ECF No. 75-13, Def.'s Mot. Ex. L, April 29, 2016 Declaration of Dr. Liza Gold, MD, ¶ 3, Ex. 2, "Gold Report" at 20, PgID 2165 ("Gold Report").) Dr. Gold did conclude that there were reasonable accommodations that could have been adopted to enable Plaintiff to maintain competitive employment at Ford, including: (1) transfer to a nonsupervisory position; (2) transfer to a relatively quiet office environment; (3) frequent breaks; (4) a flexible work schedule; and (5) use of medical or FMLA leave to attend therapy or used judiciously to decrease stress. (Gold Report at 18, PgID 2163.) Dr. Gold further opined that "the use of Mr. Arndt's service dog could have been considered in conjunction with or following the implementation of the above suggested accommodations." (*Id.*) Dr. Gold also opined that even with a service dog, Plaintiff would not be able to sustain a position on the plant floor without extended absences. (*Id.* at 17, PgID 2162.) The Sixth Circuit has recognized that "an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Ford v. EEOC*, 782 F.3d at 761. Plaintiff does not even suggest that a reasonable accommodation for his PTSD would be to permit him to take multiple leaves of absence. Indeed, in his accommodation requests submitted to Ford on February 26, 2013 (later withdrawn) and February 21, 2014, Plaintiff acknowledged that any delay in addressing his request for an accommodation could result in further absences from the workplace and that the absences from work that

44

were being caused by his PTSD were interfering with his ability to perform his job and be productive to the company.

Plaintiff stresses the fact that he was absolutely qualified for his job, that he received good reviews from his supervisors, that he had excellent communication and organizational skills. However, Plaintiff's performance evaluations in early 2013, that indicated he demonstrated "emotional resilience in a very stressful area," were short lived and soon after this period "Mr. Arndt's occupational impairments, including the ability to tolerate stress over long periods of time, began to once again become problematic." (Gold Report at 12, PgID 2157.) Plaintiff does not deny these facts. Plaintiff cites the sound of the sirens, that are frequent on the plant floor, as particularly stressful triggers for his PTSD as they sounded like Iraqi sirens and once caused him to suffer an incidence of urinary incontinence at work. (Gold Report at 13, PgID 2158.) Plaintiff revealed to Dr. Lindsay-Westphal that he had once missed work for a week because of his PTSD symptoms and he feared that if he had gone to work, he may have lost his temper and hurt someone. (Lindsay-Westphal Dep. 39:14-25.) Plaintiff does not deny that this occurred and does not deny having reported this information to Dr. Lindsay-Westphal. Dr. Gold documented these same reports from Plaintiff:

One of the most significant issues that appears repeatedly in Mr. Arndt's

medical records is the repeated documentation of Mr. Arndt's
irritability, anger, and his fears that he will become physical with
someone while angry.  The medical records also reflect Mr. Arndt's
report to his therapist Dr. Carol Lindsay-Westphal of at least four
occasions where he became physically threatening or assaulted others
due to symptoms of PTSD, one of which occurred in the Van Dyke
workplace.

(Gold Report at 10, PgID 2155.)

The only evidence submitted by Plaintiff to support the assertion that Cadence

could have enabled Plaintiff to perform the essential functions of his job as a

manufacturing supervisor/process coach, is the testimony of Cadence's dog trainer,

Joseph Tullier.  But Mr. Tullier's testimony, which stands in opposition to the

testimony of Dr. Lindsay-Westphal and Dr. Liza Gold, both of whom opined that

having Cadence as an accommodation would not enable Plaintiff to perform the

functions of his job as a manufacturing supervisor, is insufficient to create a genuine

issue of material fact regarding whether Plaintiff's use of a service dog on the Ford

manufacturing plant floor would have enabled him to perform the essential functions

of his job. Mr. Tullier had a tremendous amount to say about Cadence's capabilities

but nothing to offer about the specifics of how the dog would enable Plaintiff to be

able to perform the essential functions of his job as a production supervisor at the

Ford Van Dyke plant.  Mr. Tullier, who testified that he had never been in a

manufacturing environment himself apart from a Seventh Grade field trip, stated that

46

Plaintiff did not request a service dog specifically for the workplace. (Tullier Dep. 109:19-112:5.) Tullier testified that he did not know specifically what problems Plaintiff was experiencing in the workplace that Plaintiff hoped a service dog would ameliorate – Mr. Tullier testified that Plaintiff did not request any training specific to his work but rather requested a "service dog for the betterment of his life." (Tullier Dep. 111:11-17.) Tullier's training did not include an on-site visit to the plant with Cadence and he had no concept of what the dog would encounter in the Van Dyke factory environment or what specific functions of Plaintiff's job Cadence would be called upon to enable Plaintiff to perform. He therefore could not opine on how the dog would react or, more specifically, how the dog would be able to assist the Plaintiff in the event of a trigger, to continue to perform his manufacturing supervisor responsibilities. Indeed, Tullier did not profess to know what Plaintiff's responsibilities entailed.

Ford offers the Declaration of Sally Montrucchio, a training director at Next Step Service Dogs, a Certified Member of Assistance Dogs International, which according to Ms. Montrucchio is the only certification recognized by the Veterans Administration for the training of service dogs. (ECF No. 75-10, Def.'s Mot. Ex. I, May 1, 2016 Declaration of Sally Montrucchio ¶ 2.) Ms. Montrucchio reviewed Mr. Arndt's case, and reviewed Mr. Tullier's training of Cadence, and concluded that the

failure to conduct an on-site assessment, among other inadequacies, rendered Mr.

Tullier's conclusions regarding Cadence's ability to perform in the manufacturing

environment false:

> More importantly, a large and important piece of [Tullier's] training with Cadence and Mr. Arndt was missing, onsite assessment at the Ford plant to determine how the dog was to be used safely and implementing of a Service Dog protocol. He assumed the stressors he used in training would equal the stressors at the Ford plant. This is a false conclusion because the Ford plant is an unusual workplace for a Service Dog.

(Montrucchio Report 3, PgID 2060.)   Plaintiff did not respond the Montrucchio

Report, except to say that Tullier's training was "extensive" and "simulated the

conditions of Arndt's work environment," and that Cadence was trained to "ground"

Plaintiff in stressful situations.   But a review of Mr. Tullier's deposition testimony

reveals that he had no notion of what conditions he needed to simulate, as he had

never been to the Ford plant (indeed he had never been in a manufacturing

environment save for one time in middle school).   Further, Mr. Tullier testified that

Plaintiff did not even request that Cadence be trained specifically for the plant

environment, but rather that Plaintiff's directive to him was to train Cadence for the

general "betterment" of Plaintiff's life.

The Court does not question that Mr. Tullier's training may have achieved the

goal he set for training Cadence – the betterment of Plaintiff's life.   However, his

testimony regarding his training of Cadence is simply not sufficient to carry Plaintiff's burden to establish, by a preponderance of the evidence, that having Cadence by his side in all aspects of his job as a process coach would have enabled him to perform the essential functions of that high stress supervisory job at the Van Dyke plant. No reasonable juror could conclude on this record, in light of the uncontroverted medical testimony of Drs. Lindsay-Westphal and Gold, even viewing the facts of Cadence's training in the light most favorable to the Plaintiff, that Cadence would have enabled the Plaintiff to perform the essential functions of his job as a manufacturing supervisor at the Van Dyke plant, including his duties on the factory floor.

"Because the accommodations – that [Plaintiff] had the burden to propose – do not address [] key obstacle[s] preventing him from performing a necessary function of a [manufacturing supervisor], he has not met his burden under the Act of proving he is an otherwise qualified individual for the position." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (alterations added). The Court concludes that there is insufficient evidence on this record on which a juror could reasonably conclude that Plaintiff could have performed his job as a production supervisor at the Ford Van Dyke plant had he been able to have Cadence with him as an accommodation.

49

Plaintiff suggests, however, that his disability could have been reasonably accommodated had Ford considered other possible accommodations, such as a desk job or another non-supervisory, low stress position. First of all, it is undisputed that Ford was still in the process of investigating Plaintiff's one and only accommodation request – to retain his position as a process coach and have Cadence as an accommodation – and had not issued a denial of that request when Plaintiff disengaged from the interactive process. Plaintiff provides no authority to support the proposition that Ford had an obligation to switch gears while it was still investigating Plaintiff's original accommodation request and affirmatively suggest that Plaintiff consider a transfer to an entirely different position. Indeed, this was a concept that Plaintiff had not embraced when Ford suggested a transfer to the Ford World Headquarters in Dearborn in connection with Plaintiff's 2013 accommodation request. An "employer has no duty to reiterate self-evident options to an employee when [the employee] is clearly aware of them." *Hankins*, 84 F.3d at 801 (alteration added).

Second, even if Ford had formally rejected Plaintiff's request for a service dog as an accommodation in his position as a manufacturing supervisor, and Plaintiff wished to pursue the alternate accommodation of a transfer to a different position, Plaintiff bore the burden to identify such a position and demonstrate his qualifications

50

to perform the essential functions of *that* job with or without accommodation:

> Employers do have a duty to locate a suitable position when a plaintiff's requested accommodation is a job transfer. *Rorrer[v. City of Stow]*, 743 F.3d [1025]at 1040 [(6th Cir. 2014)]. But "to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.* (quoting *Kleiber*, 485 F.3d at 870). And "an employer need only reassign the employee to a vacant position." *Id.* (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)); *see also Burdett–Foster [v. Blue Cross Blue Shield of Michigan,]* 574 Fed. Appx. [672] at 680 [(6th Cir. 2014)] ("Even if Burdett–Foster had requested a transfer to a new position (and she made clear in her deposition that she had not), such an accommodation is reasonable only if there is another position for which she would have been qualified."); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008) (affirming summary judgment for employer in part because plaintiff failed to identify a specific job and demonstrate that she was qualified for it).

*Deister*, 91 F. Supp. 3d at 929.

Here, however, there is no evidence in the record that Plaintiff pursued a transfer or suggested that a different position might be more appropriate given his limitations before resigning and stopping the interactive process on his requested accommodation of a service dog to accompany him in his position as a process coach. Nor did Plaintiff develop evidence after the fact that he was indeed qualified, with or without accommodation, for another specific open position at Ford. In fact the only evidence regarding discussions of a "desk" job involved Plaintiff's negative response to the idea of a desk job in Dearborn. Plaintiff suggests that there is an issue of fact

regarding whether Plaintiff rejected the notion of a desk job in general or just rejected the idea of working in Dearborn, where the heavy presence of the Arab population (women in burkas, etc.) tended to trigger his PTSD. But this issue of fact is not material because, even viewing the evidence in the light most favorable to the Plaintiff, it is undisputed that he did reject the suggestion and further there is no evidence that Plaintiff ever abandoned his initial accommodation request and/or requested a transfer or a desk job as an alternate reasonable accommodation.

The evidence demonstrates that Plaintiff's one and only accommodation request was that he be permitted to have his service dog with him at all times in his position as a manufacturing supervisor, including on the factory floor where he admitted he often encountered the stressors related to his PTSD. Plaintiff's suggestion that he somehow indicated to Ford that he was willing to abandon that accommodation request and accept a transfer as an alternative accommodation simply finds no support in the record. Even viewing the facts in the light most favorable to the Plaintiff, i.e. that he was never formally offered a desk job in Dearborn and therefore never formally rejected such an offer, his own testimony regarding those events reveals that Ford did suggest such a position and he did reject it. The record is clear that Plaintiff's one and only request has been to have Cadence with him at all times as accommodation to enable him to perform the functions of his job as

52

manufacturing supervisor/process coach. As he stated in his deposition: "Ford hired me to be a production supervisor, not to work in the glass house." (Arndt Dep. 201:19-25.)

There is simply no evidence in this record on which a reasonable juror could conclude that Plaintiff revealed to Ford that he was prepared to give up on his request to continue with Ford as a process coach at the Van Dyke plant with his dog Cadence as his accommodation and/or that he wished to entertain a transfer to a different position in lieu of that accommodation. Nor has Plaintiff developed any evidence in the record to demonstrate that Plaintiff would be qualified for a transfer to any specific available position, with or without accommodation. *See Deister*, 91 F. Supp. 3d at 928-29 (finding summary judgment appropriate where plaintiff failed to identify a specific position for possible transfer and failed to demonstrate that he possessed the qualifications, with or without accommodation, to perform such a job).

Ford's expert, Dr. Gold, did opine that there could have been reasonable accommodations that could have been adopted to enable Plaintiff to maintain competitive employment at Ford, such as transfers to non-supervisory, quiet office environments. But Dr. Gold's opinion was rendered without reference to the availability of any such positions at Ford and without reference to the specifics of any such position at Ford. Dr. Gold based these recommendations on national guidelines

53

and Department of Labor Disability Employment Policies, *see* Gold Report at 18-19, PgID 2163-65, and did not profess to have any knowledge of the specific positions at Ford that might be open to Plaintiff or what job functions those positions would entail and her Report does not attempt to identify any specific position at Ford for which Plaintiff was qualified with accommodation. Such evidence does not suffice to meet Plaintiff's burden to demonstrate that he was qualified for a specific available position at Ford, with or without accommodation. There is simply no evidence in the record that Dr. Gold was presented with specific positions that were available for transfer and that she offered an opinion on whether Plaintiff could have performed those jobs with a reasonable accommodation. *Kleiber*, 485 F.3d at 870-71 (evidence from medical personnel that plaintiff was capable of general factory work or certain tasks generally associated with factory jobs insufficient to create genuine issue of material fact that plaintiff possessed an ability to perform the essential job functions of any particular available position with or without reasonable accommodation). The Court, and therefore a reasonable juror, could only speculate whether a non-supervisory, low stress, quiet office job would have been available for transfer at Ford, and whether Plaintiff would have been able to perform the essential functions of that particular position with or without accommodation.

Plaintiff has failed to present evidence sufficient to carry his burden to

establish that having Cadence as an accommodation would enable him to perform the essential functions of his manufacturing supervisor job. Moreover, Plaintiff has failed to establish that Ford had an obligation, while still researching Plaintiff's principal accommodation request, to also research the availability of other positions and to initiate with Plaintiff, while still investigating the presence of Cadence as a reasonable accommodation, the discussion of a possible transfer to a different position. Even assuming that Ford did have such an obligation, Plaintiff never requested a transfer as an accommodation and has not identified such a position at Ford that he would be qualified to perform, with or without accommodation. Accordingly, the Court concludes that Plaintiff's *prima facie* case fails at step two because he has failed to establish that he could perform the essential functions of his job with or without accommodation.

    **2.**     **Even assuming Plaintiff has presented evidence that he is qualified for a position with a reasonable accommodation, Plaintiff has not produced sufficient evidence on which a reasonable juror could conclude that Ford failed to engage in the interactive process in good faith.**

It is undisputed that the interactive never process in this case never progressed to a denial by Ford of Plaintiff's one and only requested accommodation. Plaintiff asserts, however, that this was due entirely to Ford's failure to engage in good faith in the interactive process.

Ford had a host of concerns with Plaintiff's proposed novel accommodation of a service dog to enable him to perform his job as a process coach at the Van Dyke plant, many of which were to be addressed at the May 13, 2014 meeting during which Plaintiff voluntarily resigned and disengaged from the interactive process. From Ford's perspective at the time of the May 13, 2014 meeting, many issues remained unresolved with respect to Plaintiff's accommodation request, including the answer to the oft-repeated questions (which had not been satisfactorily answered from Ford's perspective) of the precise job functions that Plaintiff was unable to perform as a result of his PTSD, whether the presence of a service dog could successfully enable him to perform these functions, whether a service dog would effectively calm Plaintiff down if his PTSD were triggered on the plant floor, whether Plaintiff would be able to respond appropriately and sufficiently if some emergency provoked his PTSD attack and whether the dog would be able to safely navigate the manufacturing plant environment. These and other legitimate concerns, from Ford's perspective, merited further investigation.

Despite Plaintiff's claims that Ford's asserted "safety" concerns were a fiction and were never actually investigated, this charge is simply not borne out by the record. In fact, Ms. Treves did walk the floor with the most senior safety person at Ford, Wendy Burkett, and got Burkett's thoughts on potential issues to explore with

Plaintiff. And in fact the very issues that Burkett raised on their walk through the plant were among the issues on the List to be addressed at the May 13, 2014 meeting. Not only were these issues unresolved at the time of the May 13, 2014 meeting, but to this day, as discussed *supra*, Plaintiff has been unable to present sufficient evidence to enable a reasonable juror to understand and resolve them in Plaintiff's favor.

Plaintiff claims that Ms. Humes was just "badgering" Plaintiff over and over again with the same question about exactly what aspect of his job he was unable to perform and asserts that this evidenced Ford's bad faith and caused Plaintiff to feel humiliated and to resign. It is undisputed that Ms. Humes was not highly experienced with handling requests for accommodation. However, the evidence demonstrates that she did seek guidance from other human resource personnel and she did consult the online resources to which her supervisors directed her. And the question that Ms. Humes did ask Plaintiff (admittedly more than once) regarding what aspects of his job he was unable to perform sought an important, indeed a required, piece of information. The ADA's implementing guidelines provides in part as follows:

> When an individual with a disability has requested a reasonable accommodation to assist in the performance of a job, the employer, using a problem solving approach, should:
>
> (1) Analyze the particular job involved and determine its

57

purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

(29 C.F.R. § Pt. 1630.9, App.) Given the nature of Plaintiff's disability and the novelty (at least for Ford) of his request to bring a service dog to work and have that dog present with him on the Ford factory floor, ascertaining his "precise job related limitations" and determining how the service dog would serve to overcome those limitations and enable him to perform his job, was not a straightforward task. When Ms. Humes and Mr. Sowers sought to "ascertain the precise job-related limitations imposed by [Plaintiff's] disability and how those limitations could be overcome [by the presence of his service dog]," Plaintiff, by his own admission, repeatedly informed them that he *could* perform all of the functions of his job, that there was nothing he could *not* do, but that he needed to have Cadence present in order to

58

perform his job. Mr. Sowers testified that this response was "contradictory," and he found it difficult to understand exactly what Plaintiff's limitations were and exactly how the service dog was going to help Plaintiff overcome those limitations. The May 13, 2014 meeting, during which Plaintiff disengaged from the interactive process and resigned his position, was designed to obtain specific answers to the very questions that the interpretive guidelines suggest.

Plaintiff questions whether the List of 14 questions that were to be asked of Plaintiff at that meeting really did exist at the time of the meeting, but there is no evidence (only Plaintiff's speculation) that would support a reasonable inference that this List was somehow prepared after the fact. Plaintiff mischaracterizes Mr. Sowers's deposition testimony when Plaintiff states that Mr. Sowers "did not believe Humes had any list of questions, or a computer." (ECF No. 88, Pl.'s Resp. 16 n. 9.) In support of this assertion, Plaintiff cites to page 59 of Mr. Sowers's deposition. Plaintiff's counsel asked Mr. Sowers at page 59 of his deposition whether Ms. Humes had anything in front of her at the May 13th meeting, to which Mr. Sowers responded that he was sure she had a notebook or something in front of her. When asked whether she had paperwork, Mr. Sowers responded that she probably did. When asked if she had a laptop, Mr. Sowers stated that he did not recall whether she did or not. (ECF No. 75-8, Sowers Dep. 59:5-17.) There was no question regarding a "list"

and certainly no statement by Mr. Sowers that he did not believe Ms. Humes had a list, nor any statement that he did make from which one could infer that Ms. Humes fabricated her testimony that she had the List of 14 questions that was to serve as the roadmap for the May 13, 2014 meeting. These questions, according to Ms. Humes, were designed by the team and were to be directed to Plaintiff at the May 13, 2014 meeting. Other Ford employees on the team testified about the team's creation of this List that Ms. Humes was directed to discuss with Plaintiff at the May 13, 2014 meeting, *see, e.g.* Treves Dep. 165:2-22, and in fact many of the questions on the list, 8-11, appear to address the identical questions raised by Wendy Burkett, the regional safety manager for Ford, who toured the plant with Ms. Treves for the very purpose of discussing Plaintiff's request and flagging the potential issues that may arise from having a dog on the plant floor. (ECF No. 88-10, Pl.'s Resp. Ex. C, January 22, 2016 Deposition of Wendy Burkett 18:13-23:8; Treves Dep. 38:25-42.) The questions on the List reflected both the general inquiries suggested in the interpretive guidelines quoted above and included specific questions that quite obviously derived from the background inquiries that Ford had made, such as Ms. Burkett's tour of the plant, in preparation for that meeting.

Plaintiff also suggests that in December, 2013, Ford learned that Cadence was going to undergo additional extensive training that would qualify the dog to assist

60

him at work, and speculates that when Ford learned this, they began plotting to replace him. (Pl.'s Resp. 8, Ex. 20, Dec. 2, 2013 letter from Joe Tullier of Acadiana Canine Training, LLC "To Whom It May Concern" at the Department of Veteran's Affairs regarding upcoming training of Cadence.) Ford responds that it did not learn of Tullier's training of Cadence until 2015, and that the December 2, 2013 letter from Tullier was submitted to Ford's defined benefit plan administrator and not to Ford. (ECF No. 92, Def.'s Reply, n. 5, Ex. B, Baumhart Decl. ¶¶ 3-5.) Plaintiff did not submit evidence to dispute this contention.

There is no evidence that Plaintiff, who bore the burden of establishing the reasonableness of his requested accommodation, ever informed Ford of the specific details of Cadence's training with Tullier and Plaintiff offers no evidence that would suggest that the Ford employees handling Plaintiff's accommodation request were apprised of these specific details of Tullier's training of Cadence in early 2014. Nor is there evidence that knowledge of that training would have affected the course of events that led to Ford's request for the May 13, 2014 meeting or would have changed the nature of the questions that were going to be asked at that meeting. As discussed *supra*, Tullier's training did not include an on-site visit to the plant with Cadence and Tullier had no concept of what the dog would encounter in the Van Dyke factory environment or what specific functions of Plaintiff's job Cadence would

be called upon to enable Plaintiff to perform.  Therefore, knowledge of Tullier's training of Cadence would not have answered the questions that Ford was prepared to discuss with Plaintiff at the May 13, 2014 meeting, specifically what functions of Plaintiff's job he was unable to perform without Cadence and, more specifically, how the dog would be able to assist the Plaintiff, in the event of a trigger of his PTSD, to continue to perform his various manufacturing supervisor responsibilities.

In further response to Plaintiff's assertion that Ford was "plotting to replace Plaintiff," Ford concedes that it did retain retiree Rob Kincer, a retired Ford employee, effective February 17, 2014, to fill Plaintiff's role under a supplemental contract that paid by the hour and could be terminated at any time.  Ford submits that Mr. Kincer's placement was temporary.  (Sowers Dep. 12:20-14:9.)  Plaintiff has produced no evidence otherwise.  Plaintiff fails to create a genuine issue of material fact that Ford was plotting all along to replace Plaintiff rather than to engage in good faith in the interactive process to address his accommodation request.

Sixth Circuit precedent suggests that, even assuming Ford was required to engage in the interactive process on these facts, Ford's conduct here is not actionable as a lack of good faith.  In *Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014), the Sixth Circuit observed:

This Court and our sister circuits have identified several situations that

62

may indicate a failure to participate in the interactive process in good faith. Failing to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith. *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 622 (5th Cir. 2009). Similarly, failing to assist an employee in seeking an accommodation may suggest bad faith. *Canny v. Dr. Pepper/Seven–Up Bottling Grp., Inc.*, 439 F.3d 894, 902 (8th Cir. 2006). This Court held in *Keith [v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir.2013)] that a cursory medical examination and summary conclusion that a disabled individual is not fit for employment violates an employer's duty to engage in the interactive process in good faith. 703 F.3d at 924.

743 F.3d at 1040-41. *See also Lafata*, 325 F. App'x at 422 (finding a lack of good faith where employer gave plaintiff a "take it or leave it" offer of only one possible position that did not account for plaintiff's physical limitations); *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 414 (6th Cir. 2015) (finding evidence of lack of good faith where employer rejected plaintiff's transfer request before discussions even began and the evidence suggested that further dialog may have produced a reasonable accommodation). Plaintiff has produced no evidence that Ford engaged in the type of bad faith conduct found actionable these cases. And notably none of these cases involved a situation where it is undisputed that the interactive process was still in progress, the employer had not rejected the requested accommodation and had placed the employee on paid leave (another reasonable accommodation) while the interactive process took place.

Plaintiff objects to the length of time that Ford took to address Plaintiff's novel accommodation request and cites *Jurgess v. Lowe's Home Centers, Inc.*, No. 05-71241, 2006 WL 2909848 (E.D. Mich. Oct. 10, 2006), for the proposition that a three week failure to accommodate has been found to be an actionable bad faith delay. However, in that case the court expressly distinguished the Sixth Circuit's holding in *Gerton v. Verizon South Inc.*, 145 F. App'x. 159, 168 (6th Cir. 2005), in which the court set forth the general rule that an employee "cannot base a disability discrimination claim upon an employer's delay in providing a requested accommodation where the delay is due to internal processing or to events outside the employer's control." *Jurgess*, 2006 WL 2909848 at *6. In *Gerton*, the delay was held to be not unreasonable where the employer placed plaintiff in a temporary position while considering her claim. *See also Edmunds v. Bd. of Control of Eastern Mich. Univ.*, No. 09-11648, 2009 WL 5171794, at *5-6 (E.D. Mich. Dec. 23, 2009) (finding that a three month delay in responding to a request was not actionable where there was "no evidence of bad faith on the part of EMU in this process and, to the extent there was a delay, it was not unreasonable under the circumstances"); *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617 (6th Cir. 2011) (in the context of the FHA reasonable accommodation requirement, finding that delay in responding to request for service animal was not a denial of an accommodation where no action was

64

taken to foreclose the requested accommodation as an option while it was being investigated). As *Gerton* establishes, "an employee must produce evidence demonstrating that any "delay in [processing] her request for accommodation was unreasonable." 145 F. App'x at 169 (alteration added). Moreover, in this case Ford placed Plaintiff on a full paid leave, a recognized form of reasonable accommodation under the EEOC interpretive guidelines, *see* 29 C.F.R. § Pt. 1630.9, App. ("other accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave"), while it investigated his requested accommodation, demonstrating a good faith effort to address Plaintiff's novel request.

An analysis of Plaintiff's specific allegations of Ford's lack of good faith (*see* Pl.'s Resp. 20-21) reveals the absence of evidentiary support for this theory of liability: First, the delay was not 15 months, it was three months. Second, while no one at Ford seemed aware of the DAP policy and its alleged guideline of a 2-3 week turnaround on a reasonable accommodation request, it is clear that Ford employees were following essentially the same requirements set forth in the DAP policy and that the 2-3 week time frame was just a guideline. Given the novelty of Plaintiff's request, no reasonable juror could conclude that Ford should have been able to research and resolve Plaintiff's request in 2-3 weeks, particularly given the insubstantial amount of information Plaintiff had provided at the time he voluntarily

65

disengaged in the process.  Third, Plaintiff's "feeling" that he was being treated with disrespect and hostility and that "secret" phone conferences were being held in his absence are insufficient bases on which a juror could infer bad faith.  Plaintiff provides no authority for the proposition that the employer cannot hold internal meetings to discuss a reasonable accommodation request, which obviously the employer is entitled to do, particularly in a case involving such a novel request. Fourth, Plaintiff suggests that Ford's health and safety concerns were a ruse and that Ford "never even spoke with plant health and safety personnel."  But in fact, Ford went above the plant health and safety personnel at the Van Dyke plant and straight to Ms. Burkett, the regional head of health and safety, and toured the plant with her to get her suggestions and concerns, which in fact formed the basis for several of the questions that Ms. Humes was preparing to ask Plaintiff at the May 13, 2014 when he quit.  Fifth, Plaintiff takes offense at the fact Plaintiff was sent home with a "no work available" or "unfit for work" status, but Ford has explained that this designation was not a description of Plaintiff's ability to work but rather was necessary so that Ford could continue to pay him his full salary while they investigated his request.  Plaintiff offers no evidence to contradict this explanation. Sixth, Plaintiff complains that Ford failed to ask Plaintiff questions about his service dog or about concerns with the dog in the workplace, yet these are precisely the

66

questions Ford was prepared to ask at the May 13, 2014 meeting and, moreover, it was Plaintiff's burden to give Ford all of the evidence he had in support of Cadence's training – it was not incumbent on Ford to go digging for that information. And finally, Plaintiff claims that Ford never made any other options available to Plaintiff, but Ford was under no obligation to do so when it had not yet made a determination to deny Plaintiff's original request. There is simply insufficient evidence on which a jury could find that Ford failed to engage in good faith in the interactive process when it is undisputed that Ford: (1) immediately put together a multi-member team, which met or had communications at least weekly if not more often throughout the three month period, to address the request and create a detailed list of questions to discuss with Plaintiff; (2) researched other manufacturing facilities that might have encountered similar requests; (3) consulted Ford's regional safety manager and brought her in for an on-site visit to get her input into the request; (4) sought information from Plaintiff's treating psychologist; and (5) placed Plaintiff on full paid leave while it investigated his novel request.

But Plaintiff claims that Ford was required to do more than investigate his one and only accommodation request – to retain his present position as a manufacturing supervisor with the accommodation of a service dog – to demonstrate good faith engagement in the interactive process. Plaintiff claims that Ford should have

revisited with Plaintiff the idea it had already proposed (and Plaintiff had already rejected) in response to Plaintiff's 2013 accommodation request, *i.e.* that Plaintiff consider transferring another position.   Apparently, Plaintiff suggests that Ford should have acted sooner to deny Plaintiff's request to retain his position as a process coach with the accommodation of Cadence and should have offered Plaintiff the alternate accommodation of a desk job.   The interactive process does not necessarily require the employer to affirmatively propose a counter offer, even if a requested accommodation is refused.   *See Jakubowski*, 627 F.3d at 202-03 (finding no obligation on the part of the employer to offer a counter-accommodation and finding no lack of good faith where the employer discussed the requested accommodation, explained why it was not reasonable and offered to help plaintiff find a different job); *American Showak*, 625 F. App'x at 711 (finding that once an employer has refused a requested accommodation, the employer "is not further 'required to propose a counter accommodation in order to participate in the interactive process in good faith'") (quoting *Jakubowski*, 627 F.3d at 203); *Horn v. Knight Facilities Mgt.-GM, Inc.*, 556 F. App'x 452, 456 (6th Cir. 2014) (finding that employer is under no obligation to propose a counter accommodation in order to participate in good faith and finding no lack of good faith despite the fact that there were no in-person meetings with the employee and despite the finding that there were other, alternative

68

methods for addressing the request); *EEOC v. Ford Motor Co.*, 782 F.3d at 766 (finding good faith participation where employer twice met with the employee and identified two alternative accommodations that were not to plaintiff's liking, putting the burden on plaintiff to propose another accommodation); *White v. Interstate Distributor Co.*, 438 F. App'x 415, 419-20 (6th Cir. 2011) (finding no lack of good faith where the entire interactive process occurred over the phone and the employee had suggested only one accommodation); *Gleed v. AT&T Mobility Servs., LLC*, 613 F. App'x 535, 539 (6th Cir. 2015) (finding that employee caused the breakdown in the interactive process when he quit after the employer offered him the accommodation of unpaid leave); *EEOC v. AT&T Mobility Servs. LLC*, No. 10-13889, 2011 WL 6309449, at *11-12 (E.D. Mich. Dec. 15, 2011) (finding that employer was under no obligation to contact plaintiff's physician to discuss alternative accommodations and concluding that if plaintiff's initial requested accommodation was flexible, it was plaintiff's obligation to inform her employer of her flexibility).

In this case, Ford was still investigating Plaintiff's one and only novel accommodation request and had not denied that request. Plaintiff cites no authority that would place the burden on Ford under the circumstances of this case to redirect the interactive process and affirmatively suggest that Plaintiff abandon his request to retain his position as a process coach with Cadence as an accommodation and instead

seek a job transfer.

Plaintiff cites two unpublished, non-binding cases that he submits support the proposition that having a service dog in a plant environment is a well-established reasonable accommodation, but neither is binding on this Court and both are distinguishable. *Branson, M.D. v. West*, No. 97-3538, 1999 WL 311717 (N.D. Ill. May 11, 1999), involved an interactive process that lasted over a year and a half and involved repeated requests for the same information on how the service dog could assist the employee (who was a paraplegic in a wheelchair who sought to have the dog pull her wheelchair rather than plaintiff manually operate her wheelchair, not a manufacturing supervisor with PTSD), and ultimately failed to decide on the request for a period of over four years. In the present case, the parties did not even get to the point of discussing exactly how the service dog would perform in the plant environment before Plaintiff voluntarily disengaged and there were no repeated requests for meaningless information that evidenced a bad faith delay. In this case, Plaintiff had provided Ford with Dr. Lindsay-Westphal's questionnaire, which did not even purport to opine on how the service dog would assist Plaintiff with the stressors he would encounter in the plant environment, and Plaintiff's own opinion of how Cadence would enable him to perform his job. *Branson* is inapt.

*Miranda v. Schlumberger Tech. Corp.*, No. 13-1057, 2014 WL 12489995

(W.D. Tex. Nov. 24, 2014), is also distinguishable. The plaintiff in *Miranda*, like Plaintiff here, was a war veteran who suffered from PTSD. The plaintiff in *Miranda* was hired to work as a mechanic at the defendant's maintenance facility and had a service dog that was trained to alleviate his PTSD symptoms. The employer in fact expressed no concerns regarding the presence of the service dog in the working environment, and the corporate representative admitted that having the service dog presented no hardship for the employer. *Miranda* says nothing about the suitability of a service dog on the plant floor at the Van Dyke transmission plant.

The Court concludes that, even assuming that a reasonable accommodation could have been reached that would have addressed Plaintiff's PTSD and enabled him to perform the functions of his job, Plaintiff has presented insufficient evidence that Ford failed to engage in good faith in the interactive process. Moreover, because Plaintiff ended the interactive process at a time when Ford was still reasonably engaged in the interactive process, Plaintiff and not Ford bears responsibility for the breakdown of the interactive process. The Court concludes that no reasonable juror could conclude that Ford, rather than Plaintiff, was responsible for the breakdown in the interactive process or that Ford failed to engage in good faith in the interactive process.

**C.    Plaintiff Has Not Created a Genuine Issue of Material Fact That He Was Constructively Discharged**

"To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727-28 (6th Cir. 2014) (citations omitted). "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Id.* (internal quotation marks and citations omitted). In determining whether the first prong of the test is met, the Court may consider whether Plaintiff has suffered a "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* at 728 (citation omitted). "[T]he denial of an accommodation, by itself, is not sufficient to prove that an employer constructively discharged an employee." *Gleed* , 613 F. App'x at 540.

Plaintiff relies on *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008), for the proposition that "a complete failure to accommodate, in the face of repeated requests," may suffice as "evidence to show the deliberateness necessary for constructive discharge." In this case, there is no evidence of either "a complete failure to accommodate" or "repeated requests for an accommodation that was denied." *Talley* cautioned that it "does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability." 542 F.3d at 1109. *Talley* instructs that only "when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, [may] a jury [] conclude that the employee's resignation was both intended and foreseeable." 542 F.3d at 1109 (alterations added). Neither condition occurred here. It is undisputed that Ford reasonably accommodated Plaintiff with paid leave while it evaluated his request to bring his service dog to work. It is also clear that Plaintiff withdrew his first request voluntarily (it was not "denied" by Ford) and that Ford was in the process of investigating his second request when Plaintiff voluntarily resigned. There is no evidence that Plaintiff was requesting action from Ford on his request and was being ignored. There is simply no evidence on which a jury could reasonably conclude that Ford repeatedly denied requested accommodations or "deliberately created intolerable working conditions"

that would have forced a reasonable person to quit. Ford placed Plaintiff on full paid leave while it investigated his accommodation request – a far cry from forcing him to endure intolerable working conditions.

The cases cited by Plaintiff are readily distinguished. *See Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004) (plaintiff was constructively discharged where she was "worked to exhaustion and poor health by an employer who was aware of [her] disability, but nevertheless refused to honor a reasonable accommodation") (alteration added); *Chavez v. Waterford School Dist.*, 720 F. Supp. 2d 845 (E.D. Mich. 2010) (teacher who suffered damage to her vocal chords following treatment for a brain tumor, and who was met with repeated denials of seemingly simple requested accommodations, coupled with disciplinary proceedings and unannounced classroom visits, constituted constructive discharge); *Benaugh v. Ohio Civil Rights Comm'n*, 278 F. App'x 501 (6th Cir. 2008) (court found genuine issue of material fact regarding constructive discharge where, after several years of being denied requests to accommodate her breathing difficulties, plaintiff finally decided she could not work another winter under such intolerable conditions and quit).

While Ford may not have been acting with the dispatch that Plaintiff would have liked, Ms. Humes and Mr. Sorrows appeared for the May 13, 2014 meeting with a List of questions, that the team had prepared over the preceding weeks, to discuss

74

with Plaintiff, indicating every intention on Ford's part to move forward with the interactive process as to Plaintiff's accommodation request. Plaintiff testified that he was anxious about the meeting on May 13, 2014 and upset that Ms. Humes had not responded to his email to let him know what was going to be discussed at the meeting. He felt at the meeting that Ms. Humes was being "condescending" toward him, and was pestering him with a question that had been asked and answered, and he resigned before the remaining 13 questions on the list could be addressed. While one of course hopes that HR employees in general approach their job with compassion, "hurt feelings are not enough to create a case of constructive discharge." *Savage v. Gee*, 665 F.3d 732, 379 (6th Cir. 2012) (internal quotation marks and citation omitted). The Court concludes that Plaintiff has failed to create a jury submissible issue on his claim of constructive discharge.

## IV.   CONCLUSION

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact that Plaintiff's PTSD could have been reasonably accommodated with or without accommodation. Even assuming Plaintiff has presented sufficient evidence on which a reasonable jury could conclude that he is qualified for a position with a reasonable accommodation, Plaintiff has not produced sufficient evidence on which a reasonable juror could conclude that Ford failed to engage in the interactive

process in good faith.  Finally, Plaintiff has failed to create a jury submissible issue on his claim of constructive discharge.

Accordingly, the Court  GRANTS Ford's motion for summary judgment.

IT IS SO ORDERED.

Dated:   **MAR 2 9 2017**

Paul D. Borman
United States District Judge

76