# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: December 13, 2017

Ms. Samantha A. Daniels
Mr. Eugene Scalia
Ms. Molly T. Senger
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036

Ms. Carol Laughbaum
33 Bloomfield Hills Parkway, Suite 250
Bloomfield Hills, MI 48304

> Re: Case No. 17-1415, *Bradley Arndt v. Ford Motor Company*
> Originating Case No. : 2:15-cv-11108

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion.

> Yours very truly,
>
> Deborah S. Hunt, Clerk
>
>
> Cathryn Lovely
> Deputy Clerk

cc: Mr. David J. Weaver

Enclosures

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0685n.06

No. 17-1415

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BRADLEY A. ARNDT, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Dec 13, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern District |
| FORD MOTOR COMPANY, | ) | of Michigan |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: GUY, MOORE, and ROGERS, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Plaintiff Bradley Arndt appeals from the entry of summary judgment in favor of his former employer Ford Motor Company with respect to his claims that Ford refused to accommodate his disability, failed to engage in the interactive process in good faith, and constructively discharged him in violation of the Americans with Disabilities Act (ADA) and Michigan's Persons With Disabilities Civil Rights Act (PWDCRA). *See* 42 U.S.C. § 12112(a); MICH. COMP. LAWS § 37.1203. Arndt contends that the district court erred in concluding that no reasonable juror could find in his favor with respect to those claims. *See Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832 (E.D. Mich. 2017). For the reasons that follow, we affirm.

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4157 Filed 12/13/17 Page 3 of 18
       Case: 17-1415     Document: 44-2     Filed: 12/15/2017     Page: 2      (3 of 18)

Case No. 17-1415                                                                          2
*Arndt v. Ford Motor Company*

# I.

Bradley Arndt, a 24-year veteran of the United States Army, was diagnosed with service related Post Traumatic Stress Disorder (PTSD) and mild traumatic brain injury (mTBI). Ford hired Arndt in August 2012 as a Process Coach supervising hourly employees at its Van Dyke Transmission Plant. Arndt supervised workers in the "clean room" where controls were assembled by employees who wear lab coats and protective eyewear. Arndt performed well, as was reflected in the year-end performance review he received for 2012.

### a.    First Request for Accommodation (February 2013)

In February 2013, symptoms of Arndt's PTSD caused him to miss a day of work and prompted him to inquire about bringing his service dog "Cadence" to work with him. Arndt approached his supervisor Vito Evola, who was initially receptive to the idea. Arndt then sent an email inquiry to Stephanie Roseman, his HR representative at the time, explaining that he had PTSD, that service dogs are trained to calm people with PTSD, and that his service dog was highly trained and carried "a certification with the ADA." Roseman responded that she would look into it and provided Arndt with the form to formally request accommodation.[1]

On February 26, 2013, Arndt returned the "Disability Reasonable Accommodation Request" asking that he "be able to bring [his] service dog to work." Arndt attached a letter similar to his earlier email to Roseman, which included the following description of the functions his service dog would provide:

> He is trained to sense when an anxiety or panic attack is going to happen, then he is able to guide me and direct me to a quiet calmer place, he is trained to keep people at an arm[']s length from my location, he also watches behind me to keep people from startling me as to not set off a trigger from me, provide Tactile Stimulation during intense moments of stress and panic, and "Watch my back,["]

---

[1] Arndt testified that Cadence had received training to help him with his PTSD symptoms, but acknowledged that there is no actual "ADA certification" for service dogs.

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4158 Filed 12/13/17 Page 4 of 18
Case: 17-1415 Document: 44-2 Filed: 12/15/2017 Page: 3 (4 of 18)

Case No. 17-1415    3
*Arndt v. Ford Motor Company*

> he also provides a great deal of comfort and security when he is near, thus giving me the utmost confidence to perform my job.

Also, in answer to the question about what job functions, if any, he was having difficulty performing, Arndt indicated that his PTSD sometimes causes him to miss work.

On March 13 or 14, 2013, Arndt met with the plant physician, Arthelia Brewer, M.D., to discuss his accommodation request. Dr. Brewer's records from that visit: (1) reflected that Arndt reported his diagnosis of PTSD; (2) noted Dr. Brewer's intention to work with human resources to find accommodation, while adding that there were health and safety concerns with allowing a dog in the manufacturing area; and (3) stated that a release of information form was "given to employee for completion to allow verbal and written communication with the social worker, psychologist and psychiatrist at the VA." Although Arndt disputes some of the details of their conversation, he testified that Dr. Brewer commented on his extensive resume and said that there would surely be a position that could accommodate his PTSD at the Van Dyke Plant or perhaps in Dearborn. Arndt admits he expressed concern to Dr. Brewer that working in Dearborn could cause PTSD-related flashbacks because of the large Arab population in the area.

On March 15, 2013, Arndt went to Roseman upset and repeated his concern about the possibility of having to work around the large Arab population in Dearborn. Arndt also told Roseman that he had been hired as a production supervisor—not to work in the "Glass House" in Dearborn (*i.e.*, Ford World Headquarters). According to Roseman, Arndt added that he did not want to sign the medical release for Dr. Brewer. Roseman encouraged Arndt to see the process through, but there is no dispute that Arndt not only verbally withdrew his request but also formally retracted it in an email sent later that same day.[2]

---

[2]In response to the motion for summary judgment, Arndt made a new claim that he had withdrawn his request, in part, because Roseman had insisted on an overly intrusive disclosure of medical records unrelated to his PTSD. But that claim does not appear in the detailed account Arndt provided to the EEOC. Nor was it mentioned during his

Case No. 17-1415                                                                                                     4
*Arndt v. Ford Motor Company*

In the wake of the retraction, Roseman sought "advice on how to proceed from here" from Maria Conliffe, Ford's Manager of Equal Employment Planning. Roseman then sent Arndt an email on April 2 stating: "The Van Dyke Transmission Plant is interested in moving forward with the ADA process in an attempt to accommodate you, but we will need medical information and authorization from you for our Medical Department to evaluate and assist with the accommodation." Arndt relies heavily on this email—referring to it as the "moving forward" email—to show that Ford considered his request to be an open matter notwithstanding his express retraction. But Arndt concedes that he never responded to the email, maintaining that he never received it. Arndt also did not approach Roseman about pursuing his accommodation request after all or otherwise reversing his retraction. As the district court concluded, there was no evidence that any further action was taken by either Arndt or Ford with respect to the February 2013 request for accommodation. *See Arndt*, 247 F. Supp. 3d at 838.

      **b.**      **Two Periods of Medical Leave (6-weeks and 4-months)**

Arndt was off work beginning on April 2, 2013, for what would become an approved six-week medical leave necessitated by his PTSD. At the time, Arndt told his treating psychologist Carol Lindsay-Westphal, Ph.D., that his worsened symptoms made him "fear that he may lose his temper unexpectedly and hurt someone." There is no dispute, however, that Arndt's symptoms subsided such that Dr. Lindsay-Westphal released him to return to work *without restrictions* on May 20, 2013.

Arndt returned to his position in the clean room, where he worked until he was moved to a Process Coach position in Machining in early October 2013. Arndt began reporting to Steve Sowers and worked in Machining for several weeks monitoring productivity from an office area

---

deposition. Rather, Arndt testified that he withdrew his request because his supervisor no longer supported it and because Arndt was "scared of going to a new environment, a new place, a new job."

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4160 Filed 12/13/17 Page 6 of 18
Case: 17-1415   Document: 44-2   Filed: 12/15/2017   Page: 5   (6 of 18)

Case No. 17-1415                                                                    5
*Arndt v. Ford Motor Company*

on the plant floor, walking the plant floor periodically, and supervising nine hourly employees. Around this time, Arndt reported to Dr. Lindsay-Westphal that he was concerned about his "chronic anger and readiness to act in an aggressive manner at signs of provocation" and that he feared he might hurt someone at work. After Arndt initiated a second leave effective October 23, 2013, Dr. Lindsay-Westphal advised Unicare (Ford's disability provider) that Arndt needed leave due to a worsening of his symptoms of PTSD. Arndt did not return to work when the initial period of leave expired in December 2013, but an extension was later approved and disability benefits were provided through February 20, 2014.

Arndt contends that—instead of "moving forward" with his previous request for accommodation—Ford was improperly scrutinizing his attendance records and plotting to replace him. Arndt relies on internal emails produced in discovery to show: that Ford gathered information about his attendance and leave records in December 2013; that Ford sent notice to Arndt about the expiration of his approved leave in January 2014; and that communications with Arndt resulted in the approval of additional leave and an anticipated return date of February 15, 2014. However, even reviewing the evidence in the light most favorable to Arndt, bad faith cannot be inferred from this evidence.

The emails also reflect that Ford learned from a telephone conversation with Arndt that he might ask to return to work with his service dog. That possibility was communicated internally, and prompted the observation from one Ford employee that Ford was "still in need of the signed medical authorization form so that [the] company physician can better understand his condition, how it prevents him from doing his job and how the accommodation will assist." But the fact that this information prompted discussions that referred to the previously withdrawn request does not show that the prior request was considered open notwithstanding its express

retraction and the absence of any further action with respect to the prior request. Further, although Arndt faults Ford for not contacting him then to get a signed authorization, Arndt was still on approved leave and had not been released back to work with or without restriction.

Finally, Arndt points to an internal email from January 2014 that he argues indicates that the plant wanted to know when they could replace him. The HR specialist responded "March 26," which was the date that Arndt's FMLA leave rights would expire. That exchange was followed by the circulation of a resume from Ron Kincer, a retired Ford employee, who was hired on a contract basis to do Arndt's job as of February 17, 2014. Arndt argues that this is evidence that Ford was plotting to get rid of him. However, Ford offered unrebutted evidence that the area was operating short four of its seven process coaches—including Arndt—and that Kincer was hired on a supplemental hourly contract basis and not as a replacement for any regular employee.

        c.     **Return with Restriction and Request for Accommodation (February 2014)**

On February 21, 2014, Arndt reported to the plant's medical department with a "Return to Work Certification" signed by Dr. Lindsay-Westphal that released him to return to work "with restrictions" identified as "presence of a service dog, Cadence." Dr. Brewer noted that Arndt arrived with Cadence, who was quiet, obedient, and unobtrusive, and that Arndt reported that Cadence had just completed three months of training in Louisiana. Arndt provided a Certificate of Registry from Acadiana Canine Training, where Cadence had received training from Joseph Tullier in late 2013 and early 2014. At that time, Arndt also signed an authorization for the release of any and all records pertaining to his PTSD.[3]

---

[3] This is the only signed authorization in the record. Dr. Brewer testified that Arndt did not sign the authorization form when they met in March 2013. And, both the "moving forward" email in April 2013 and the internal Ford email in January 2014 reflect Ford's belief that a signed authorization had not been received. Although Arndt

Case 2:15-cv-11108-PDB-APP ECF No. 109 PageID.4162 Filed 12/13/17 Page 8 of 18
Case: 17-1415  Document: 44-2  Filed: 12/15/2017  Page: 7 (8 of 18)

Case No. 17-1415                                                            7
*Arndt v. Ford Motor Company*

Arndt took the return-to-work release directly to human resources, where he met with HR representative Karen Humes, who was new to Ford and had taken over Roseman's responsibilities. Arndt testified that Humes was abrupt, callous, and condescending then and during every interaction they had. Humes had Arndt fill out a new "Disability Reasonable Accommodation Request" in which Arndt asked to "bring [his] service dog to work so [he] can be as productive as possible." This time, in answer to the question about what, if any, job function he was having difficulty performing, Arndt wrote: "hypersensitivity / emotional control / fear / loud noise / closed in spaces / people surprising you / all these issues [a]ffect my ability to function daily / my dog takes this away." As for what limitations were interfering with his ability to perform his job, Arndt answered, "facing life's small overlooked issues traveling in car anxiety of being around people and startling." Arndt also gave Humes a copy of the Certificate of Registry from Acadiana Canine Training.[4]

At the direction of HR Manager Joan Treves, Arndt was moved from medical leave to active status the same day and classified as "no work available" while his service dog restriction/accommodation was considered. Treves testified that this was done in order for Arndt to receive full pay and benefits (but no overtime) without reporting to work. Arndt remained in that status from February 21 until he resigned his position during a meeting about his request on May 13, 2014.

    **d.**    **Interactive Process (February 21, 2014 – May 13, 2014)**

Ford assembled a working group to evaluate what was a novel request to bring a service animal onto the plant floor. That group was convened by Conliffe, Ford's Manager of Equal Employment Planning, and included Treves and Humes from Human Resources, Les Harris from

---

belatedly stated by way of affidavit that he signed an authorization in March 2013, the evidence in the record could not lead a reasonable juror to conclude that he had.

[4] Tullier conceded that this was a designation he alone provided and that there is no official designation or registry.

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4163 Filed 12/13/17 Page 9 of 18
Case: 17-1415  Document: 44-2  Filed: 12/15/2017  Page: 8 (9 of 18)

Case No. 17-1415                                                                                     8
*Arndt v. Ford Motor Company*

Personnel Relations, the Executive Medical Director Dr. Heckman, and an attorney from the Office of General Counsel. The fact that this group met a number of times to discuss Arndt's request is undisputed, although Ford successfully resisted discovery concerning the content of those communications. Even so, there is other evidence about what was done (and not done) between February 21 and May 13.

Conliffe testified that she contacted an industry group and a service dog organization but neither had experience with having a service dog on a manufacturing plant floor. Treves testified that she provided guidance to Humes, who was directly responsible for communicating with and gathering information from Arndt. Treves briefly toured Arndt's work area with Wendy Burkett, a regional safety manager, in order to understand what questions to ask of Arndt and what factors to consider in having a service dog on the plant floor. Treves also consulted with Arndt's supervisor Steve Sowers about potential issues with having a service dog around the machinery.

On March 4, 2014, Arndt met with Humes and Sowers to provide more information about his accommodation request. Arndt brought Cadence with him, and Arndt testified that he was upset because Sowers commented that Cadence looked "lazy." Humes asked Arndt several times to explain what job functions he had difficulty performing, and Arndt answered that he did not have difficulty with any job functions but that he could react in unknown ways to people or sounds in the environment because of his PTSD. To provide more detail, Arndt supplemented his written accommodation request with the following handwritten note:

> 1) Traveling to work … issues with traffic to and from work […] cars on side of the road … create hostile memories, service dog enables this travel
>
> 2) My abilities are not impaired to work, it is the environment [] which is present that causes severe anxiety / fear / transferred memories "flashbacks" to war time environment. Service dog is trained to sense these issues and acts to prevent these issues [from] occurring.

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4164 Filed 12/13/17 Page 10 of 18
Case: 17-1415  Document: 44-2  Filed: 12/13/2017  Page: 9  (10 of 18)

Case No. 17-1415                                                                                               9
*Arndt v. Ford Motor Company*

Arndt tried to explain that Cadence was trained to sense his anxiety, and was trained to "whine and make a big scene" to give him a reason to leave an area when stressors triggered symptoms of his PTSD.

The next day, Humes mailed Ford's "Primary Care Physician Accommodation Questions" to Dr. Lindsay-Westphal at the VA. When a response was not received by March 25, Humes sent Arndt a certified letter asking him to contact his doctor, advising him that Ford could not proceed with his request without it, and reminding him that Ford would not continue to pay him indefinitely without the information to process his request. Arndt took the questionnaire to his doctor, and then hand delivered the completed form to Humes on April 4, 2014.[5]

The completed questionnaire from Dr. Lindsay-Westphal stated that she and several other professionals at the VA had diagnosed Arndt as having PTSD. Other questions asked what functions the employee was unable to perform, the specific ways in which the impairment prevented the employee from fulfilling the job requirements, other life activities that were impacted, and the details of any accommodation that would allow Arndt to perform the requirements of the job. Dr. Lindsay-Westphal offered her opinion that "Mr. Arndt is very capable in the skills required for a process coach" and stated that she was "unaware of any functions of the process coach that Mr. Arndt is unable to do." She identified his "biggest obstacle" to be "the ordinary events that come with maintaining a full time job, such as transportation and unexpected negative interactions with strangers or co-workers." As for the requested accommodation, Dr. Lindsay-Westphal indicated, in pertinent part:

> . . . The presence of his trained service dog enables him to maintain his high level of functioning by sensing tension and calming him before the tension becomes problematic.

---

[5]The VA returned the letter unopened and marked "undeliverable." Arndt implies some misfeasance by Ford in addressing the envelope because Humes misspelled his doctor's name as "Lindsey-Westphal" and did not identify her as a doctor. (Pl's Brief, p. 29.) But there is simply no evidence that Ford was at fault for the delay.

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4165 Filed 12/13/17 Page 11 of 18
Case: 17-1415 Document: 44-2 Filed: 12/15/2017 Page: 10 (11 of 18)

Case No. 17-1415　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　10
*Arndt v. Ford Motor Company*

> . . . Were he to return to work today, I believe he would again perform the duties well. Over time, however, unless he has his service dog to help him remain calm and well-focused on tasks at hand, his longevity in the workplace is doubtful. In respect to specificity, problems may arise if, for example, Mr. Arndt has a flashback en route to work, is especially distracted and emotionally distressed by intrusive thoughts, feelings and memories around the anniversary of traumatic combat events. In such cases, he may have a difficult time making it to work. In respect to severity, without his service dog, his symptoms are very severe, with the presence of his service dog, these symptoms would probably go unnoticed to all but Mr. Arndt or a mental health professional well trained in PTSD.

　　　　　　　　　　　\*　　\*　　\*

> . . . Were Mr. Arndt allowed to have his service dog in his vehicle on his commute to and from work, and under his desk in his office during his shift, the dog would provide the calming interventions that will enable him to complete his job duties.

Dr. Heckman testified that he reviewed both Dr. Lindsay-Westphal's responses and the medical records that were received by Dr. Brewer. Ford viewed the records as confirming Arndt's diagnosis of PTSD.

According to Humes, a list of questions to ask Arndt at the next meeting was generated between April 4 and May 8. On May 8, Humes contacted Arndt and insisted that he come to a meeting on one of three dates. Under threat of discipline if he failed to appear, Arndt cancelled medical appointments and agreed to meet on May 13. Arndt took offense that Humes confirmed the meeting by phone, voicemail, and email. He also was upset and felt uncertain about the purpose of the meeting, as is reflected in an email he sent to Humes on Saturday, May 10. Humes did not respond to that email.

On May 13, 2014, Arndt brought Cadence with him to the meeting with Humes and Sowers. Arndt testified that he felt disrespected when Sowers failed to make eye contact with him, although Sowers tried to explain that he was looking at production numbers. Humes explained that they had some more questions, but they did not get past the first question, which

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4166 Filed 12/13/17 Page 12 of 18
Case: 17-1415 Document: 44-2 Filed: 12/15/2017 Page: 13 (12 of 18)

Case No. 17-1415                                                                                         11
*Arndt v. Ford Motor Company*

asked what job functions he was unable to perform. Arndt responded that he'd answered this question over and over, but Humes continued to ask, "What can't you do?" At that point, Arndt took out his employee badge and resigned. Humes encouraged Arndt to stay, but Arndt declined when he could not be assured that a decision would be made by the following Monday. As a result, Arndt's employment terminated before Ford reached any conclusion about his requested accommodation.[6]

Arndt's handwritten note stated that his resignation was of his "own accord and not influenced by anyone either from Ford Motor Company or the Van Dyke Transmission Plant." Nonetheless, Arndt contends that he was constructively discharged by Ford's failure to accommodate him or engage in the interactive process in good faith.

### e.    Procedural History

Arndt filed an EEOC complaint and submitted a separate four-page letter describing his claims. The EEOC dismissed the complaint, and Arndt commenced this action in March 2015. After conducting discovery, Ford moved for summary judgment in its favor. Over Arndt's opposition, the district court granted Ford's motion and judgment was entered accordingly. This appeal followed.

## II.

This court gives fresh review to the district court's decision granting summary judgment and will affirm if there is no genuine dispute as to any material fact such that the moving party is entitled to summary judgment as a matter of law. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 760

---

[6]Although Arndt doubts that Humes really had a list of questions, Ford produced a memo that consisted of 14 questions relating to Arndt's request for accommodation. The first question asked what job functions, if any, he could not perform without accommodation. Several other questions asked for specifics about the service dog; its training; and how it would handle safety equipment, automated vehicles in the plant, exposure to contaminants, and interaction with other employees. Another question referenced Dr. Lindsay-Westphal's suggestion that Arndt could be accommodated by having the dog under his desk, and asked whether he agreed and whether the dog would stay in the office area or whether he "intend[ed] to have the service dog by [his] side at all times while at work."

Case No. 17-1415                                                                          12
*Arndt v. Ford Motor Company*

(6th Cir. 2015) (en banc); *Kleiber v. Honda Mfg. of Am., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). In making this determination, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Ford*, 782 F.3d at 760. A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. AT&T Mobility Servs., LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.[7]

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of a disability.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). There is no dispute that Arndt's PTSD is a disability under the ADA. The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). The ADA also prohibits discrimination because of disability with regard to "hiring, advancement, or discharge." 42 U.S.C. § 12112(a). "An 'otherwise qualified individual' is one who 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Rorrer*, 743 F.3d at 1039 (quoting 42 U.S.C. § 12111(8)). Arndt maintained that he was "otherwise qualified" because he could have performed the essential functions of his job *with* accommodation—namely, being able to bring his service dog to work with him. He also argues that Ford constructively discharged him.

---

[7]Because the PWDCRA "substantially mirrors" the ADA, and neither party objects, both claims are analyzed together under the ADA standards. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012).

### a.  Failure to Accommodate

To establish a *prima facie* case for failure to accommodate, Arndt must show (1) he was disabled, (2) he was "otherwise qualified" with or without accommodation, (3) his employer knew or had reason to know of his disability, (4) he requested a reasonable accommodation, and (5) his employer failed to provide the accommodation. *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 680 (6th Cir. 2014). Because Arndt cannot show he was denied accommodation or that Ford failed to engage in the interactive process in good faith, summary judgment was properly granted.

#### 1.  Denied Accommodation?

When a disabled employee requires accommodation, the employee bears the burden to propose a reasonable accommodation. *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202-03 (6th Cir. 2010); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998). Arndt made two explicit requests for accommodation: one on February 26, 2013, and one on February 21, 2014. But in neither instance did Ford refuse to provide the requested accommodation. The first request was expressly withdrawn and did not remain open—notwithstanding the "moving forward" email—especially since Arndt returned to work without restriction and no other action was taken with respect to that request by Arndt or Ford. *See Leeds v. Potter*, 249 F. App'x 442, 449-50 (6th Cir. 2007). As for the second request, no conclusion had been reached and the interactive process was ongoing at the time Arndt resigned.

Nor can Arndt rely on informal discussions he claims to have had after returning from his first medical leave to show that Ford refused to accommodate his first request. The only evidence supporting this argument is Arndt's statement by way of affidavit that he had ongoing discussions with a night manager and another supervisor about his PTSD, telling them that he

Case 2:15-cv-11108-PDB-APP ECF No. 109 PageID.4169 Filed 12/13/17 Page 15 of 18
Case: 17-1415 Document: 44-2 Filed: 12/15/2017 Page: 14 (15 of 18)

Case No. 17-1415                                                                                              14
*Arndt v. Ford Motor Company*

"had to take a medical leave because of it" and "about environmental issues at the plant that could cause [him] anxiety or flashbacks." The district court refused to consider this undeveloped argument. Even accepting the averment, however, such discussions are not sufficiently specific under the circumstances to infer that a request for accommodation was made when Arndt had made and retracted a formal request for accommodation, took medical leave necessitated by his disability, and then returned to work without restriction. *Id.*; *see also Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350-51 (6th Cir. 2015) (distinguishing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)).

### 2. *Failure to Engage in Interactive Process?*

The ADA's regulations require an employer "'to initiate an informal, interactive process' when necessary to determine how an employee's disability limits [his] ability to work and to identify appropriate reasonable accommodations." *Williams*, 847 F.3d at 395 (quoting 29 C.F.R. § 1630.2(o)(3)). But an employer's failure to do so will be independently actionable only if plaintiff can also show that he could have performed the essential functions of his job with an accommodation. *EEOC v. Ford*, 782 F.3d at 766.

"[T]he interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* (citation omitted); *see also Rorrer*, 743 F.3d at 1040. Here, Arndt terminated the interactive process by resigning his position, but he contends that he did so only because Ford failed to engage in the interactive process in good faith. He argues that a jury could find undue delay, inadequate interactive process, and redundant requests for information.

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4170 Filed 12/13/17 Page 16 of 18
Case: 17-1415 Document: 44-2 Filed: 12/15/2017 Page: 19 (16 of 18)

Case No. 17-1415                                                                                15
*Arndt v. Ford Motor Company*

These arguments fail. First, although Arndt argues that Ford unreasonably delayed in making a decision, the district court did not err in determining that the relevant interactive process was not triggered until Arndt was released to return to work with the service-dog restriction and made his second request for accommodation. Humes received Arndt's request for accommodation on February 21, met with Arndt on March 4, obtained Dr. Lindsay-Westphal's response to the questionnaire on April 4, and met with Arndt for the third and final time on May 13. Arndt argues that Ford failed to comply with the timeline in its own ADA policy, but the very timeline he relies on stated that it is a guideline and that the turn-around time can vary depending on the circumstances. The novelty of Arndt's request made it reasonable for his process to take longer than average.

Second, despite Arndt's distress about being repeatedly asked which job functions he had difficulty performing, the ADA's guidelines advise the employer to "[c]onsult with the individual with a disability to ascertain the precise job-related limitations imposed by [his] disability." *Arndt*, 247 F. Supp. 3d at 859 (quoting 29 C.F.R. § 1630.9, App.) It may be that a different HR person could have framed the question better or broken it into more specific questions that might have drawn out the information Ford needed. But, however abrupt or condescending Humes may have been, asking him this question even multiple times does not support a finding that Ford failed to participate in the process in good faith.

Finally, the claim that Ford was at fault for the breakdown because it did not propose an alternative accommodation is without merit. First, Ford had not reached any conclusion about the accommodation that Arndt had specifically requested at the time Arndt resigned. Second, Ford was aware that Arndt had objected to the idea that a transfer to Dearborn might be a possible alternative accommodation the previous year. Moreover, an employer is not required to

Case 2:15-cv-11108-PDB-APP ECF No. 109, PageID.4171 Filed 12/13/17 Page 17 of 18
Case: 17-1415   Document: 44-2   Filed: 12/15/2017   Page: 18   (17 of 18)

Case No. 17-1415                                                                                    16
*Arndt v. Ford Motor Company*

counter with an alternative accommodation in order to have participated in the interactive process in good faith. *Jakubowski*, 627 F.3d at 202-03; *see also EEOC v. Ford*, 782 F.3d at 766 (finding good faith where, among other things, the employer offered alternative accommodations "even though it was not legally required to counteroffer").

Drawing all reasonable inferences in favor of Arndt, no reasonable jury could conclude that Ford failed to engage in the interactive process in good faith, or that Ford was responsible for the breakdown in that process before a reasonable accommodation could be identified.

### b.   **Constructive Discharge**

To establish a *prima facie* case of discriminatory discharge under the ADA without direct evidence of discrimination, Arndt must show (1) he was disabled, (2) he was otherwise qualified to perform the essential functions of his job with or without accommodation, (3) he suffered an adverse employment action, (4) his employer knew or had reason to know of his disability, and (5) the position remained open or a non-disabled person replaced him. *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). Constructive discharge is recognized as an adverse employment action under the ADA. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008). This claim does not survive summary judgment here because a reasonable jury could not find that Arndt was constructively discharged.

Constructive discharge "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Id*. (quoting *Smith*, 376 F.3d at 533). In *Talley*, this court held that "when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable." *Id*. at 1109. That is not the case here. Arndt withdrew his first

Case No. 17-1415                                                                                          17
*Arndt v. Ford Motor Company*

request and Ford was actively evaluating his second request when he resigned.

Further, to prove constructive discharge the plaintiff must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id*. at 1107 (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). For example, the plaintiff in *Talley* had physical problems with her back and knee that made her unable to stand for more than 15 minutes and proposed as an accommodation that she be able to use a stool while working the cash register at the Dollar Store (an accommodation she had used at times but was no longer allowed). *Id.* at 1108. This court found that there was a question of fact where the plaintiff was denied use of the stool, her supervisor refused to read the doctor's note she was asked to provide, no meeting was organized to discuss her accommodation, and the plaintiff reasonably expected that she would be forced to work in excess of her medical restrictions. *Id*. at 1109; *see also Smith*, 376 F.3d at 537 (finding question of fact on constructive discharge where jury could find plaintiff was denied reasonable accommodation and forced to work in excess of her medical restrictions).

Here, although Arndt was clearly frustrated by the process and felt badgered and disrespected, Ford did not repeatedly reject or refuse to consider his requests for accommodation but rather placed him on full pay while his second request was being considered. The district court did not err in concluding that there was no evidence that Ford "deliberately created intolerable working conditions that would have forced a reasonable person to quit." *Arndt*, 247 F. Supp. 3d at 865-66 (internal quotation marks omitted).

\*          \*          \*

The district court's judgment in favor of Ford Motor Company is **AFFIRMED.**